(No. 39428.—

HAROLD A. MILLER *et al.,* Appellees and Cross-Appellants, *vs.* LYLE V. DEWITT *et al.,* d/b/a DEWITT-AMDAL & ASSOCIATES, Appellants.

*Opinion filed January 19, 1967.—Rehearing denied March 27, 1967.*

274

House and Klingbiel, JJ., dissenting.

Giffin, Winning, Lindner & Newkirk, of Springfield, (Alfred F. Newkirk, of counsel,) for appellants.

Grenias & Owen, of Decatur, for appellees Harold A. Miller, Ellis Furry and Donald E. Engel.

Earl S. Hodges, of Springfield, (Samuel C. Patton, of counsel,) for appellee Maroa Community Unit School District.

Le Forgee, Samuels, Miller, Schroeder & Jackson, of Decatur, (Carl R. Miller, Jerald E. Jackson, and Robert W. Ohlsen, of counsel,) for appellee Fisher-Stoune, Inc.

Heyl, Royster, Woekler & Allen, of Peoria, and Yates, Fisk, Haider & Burke, of Chicago, (Lyle W. Allen, and Tom L. Yates, of counsel,) for *amici curiae*.

Mr. Justice Underwood delivered the opinion of the court:

The plaintiffs, Harold A. Miller, Ellis Furry and Donald E. Engel were injured as the result of the collapse of the roof of a school gymnasium on which they were working as employees of a contractor, Fisher-Stoune, Inc. They brought this action to recover for their injuries against the supervising architects, Lyle V. DeWitt and Russell M. Amdal, d/b/a DeWitt-Amdal & Associates, and the

owner, Maroa Community Unit School District No. 2, alleging common-law negligence by the architects and a violation of the Structural Work Act by both the architects and the school district. The architects filed a third-party complaint against the contractor which was dismissed on the contractor's motion before any evidence was heard. At the trial the jury returned verdicts against the architects and for the plaintiffs, Miller, Furry and Engel, in the amounts of $30,000, $90,000 and $5,000 respectively. The jury also found for the defendant school district, and judgments were entered on the verdicts.

The architects appealed from the verdicts against them and from the order dismissing their third-party complaint. Plaintiffs cross-appealed from the judgments against them in favor of the school district. The Appellate Court for the Fourth District in an exhaustive opinion affirmed all the actions of the trial court. (*Miller* v. *DeWitt,* 59 Ill. App. 2d 38.) The case comes before us on the certification of the appellate court that the case involves a question of such importance that it should be decided by this court. Ill. Rev. Stat. 1965, chap. 110, par. 101.32.

At the outset this case presents a novel issue of first impression before this court relating to the obligations of architects who undertake both the design and supervision of construction. Stated briefly it is the position of defendant architects, and various associations of architects who have filed a brief as *amici curiae,* that a supervising architect has neither the right nor the duty to control the methods used by the contractor but has only the duty to see that the construction when completed meets the plans and specifications contracted for by the owner.

Plaintiffs insist, however, that under the facts of this case the architects had a duty to prevent the contractor from carrying out the work in a faulty manner.

This question must be posed in its proper factual con-

text. Prior to April 14, 1959, Maroa Community Unit School District No. 2 decided to remodel and enlarge the gymnasium at the high school and contracted with defendant architects for architectural services in connection therewith. Pursuant thereto, the architects prepared the necessary plans, specifications and proposed contracts, and caused bids to be received which resulted in the letting of three contracts, one to Fisher-Stoune, Inc., for the general construction work, one for the plumbing and heating, and one for the electrical work.

The plans for the remodeling job called for the removal of the west wall of the gymnasium; the removal of a proscenium truss from that point to the new west wall of the new gymnasium; the removal of two steel columns in the old west wall, which together with the proscenium truss originally supported the west ends of four east-west roof trusses; the substitution of a new north-south main-bearing truss into which would be fastened the west ends of the old roof trusses and the east ends of the trusses in the new structure. The plans showed the reaction at each end of the main-bearing truss, which would be the total weight to be supported by that truss upon completion of the new and remodeled building. This weight was the total of the weight of the new roof and the weight of the old roof, including both the dead load (weight of the structure itself) and the live load (snow, gymnasium equipment attached to the roof, impact from the use of such equipment, etc.). The weight of the new roof could be computed from the information shown on the plans; and by subtracting that figure from the total reaction shown on the plans the weight of the old roof could be obtained.

Late in April, 1960, Byron Beals, superintendent for the contractor, after making personal observation of the original structure and examining the plans, determined to shore up the west ends of the east-west trusses during the

transition by means of columns of tubular steel scaffolding placed approximately under the west ends of each of the said four east-west trusses, plumbed and snugged up against said trusses with timbers. This system was followed, with each of the columns of shoring being identical, and similarly placed. The columns were tied together only by a nailing strip to hold up a canvas tarpaulin, and a 2 x 4 strip covered with plywood and covering approximately the lower four feet on the inside.

On the morning of May 3, 1960, an ironworker crew employed by Fisher-Stoune, Inc., which included the three plaintiffs, Paul Shaffer, and their foreman, Nate Vandervoort, came to the scene and started the removal of the proscenium arch and the steel columns at the west end of the old gymnasium, the brick wall having theretofore been removed. They first erected two steel columns at the west end of the new gymnasium, then disconnected the two center east-west roof trusses from the proscenium truss, and the proscenium truss from the two steel columns, and moved it to its new location. It was stipulated that when the two center east-west roof trusses were disconnected from the proscenium truss, all of that part of the roof load which had theretofore been supported by the west ends of such two center east-west trusses was transferred respectively to the shores thereunder. This occurred at approximately 11 :00 A.M.

About 1 :00 P.M. operations were commenced to remove the north steel column. A crane was placed in the area of the new building, with a derrick or boom extending over in the vicinity of that column. A steel cable with a loop or eye at each end, called a choker, was then wound around the column above the center, and with one loop threaded through the other and then hooked to the boom. At that time, a "strain" was taken on the cable by the crane operator sufficient to take up the slack and take the kinks out of the choker for the purpose of holding the column from

falling down when it was disconnected. The heads of the bolts connecting the north roof truss to the webbing of the north column were then cut off; and while the plaintiff Miller, with an acetylene torch, was cutting off the base of the column, one of the other plaintiffs was out on the truss, knocking the bolts out. When the last bolt was knocked out, the crane took the column away and the plaintiffs moved over to repeat the process on the south column.

It was stipulated that upon the removal of the north column, that part of the roof theretofore supported by the west end of the north truss was transferred to the shore thereunder. The time was then approximately 2:00 P.M.

The method of removal of the south column was similar. The crane was moved to the south and the boom extended over to the vicinity of that column at an angle. The choker was then attached to the column at a point which was variously testified to as being some five to eleven feet from the top. A "strain" was then taken on it sufficient to take up the slack and take out the kinks in the steel cable. Plaintiff Miller proceeded to cut off the base of the column and then stepped back to the east against the tarpaulin to see if he could see daylight underneath and thus determine that it was cut clear through. There is a dispute in the evidence as to whether or not a second additional strain was taken at that time.

While Miller was cutting the column off at the bottom, plaintiff Furry was out on the south of the east-west trusses, knocking the bolts out at the top where the west end of the truss was fastened into the east webbing of the column. Plaintiff Engel was standing on the roof watching. At the approximate time that Furry knocked out the last bolt, the roof collapsed. The force of the air and the movement of the tarpaulin knocked Miller out into the new part of the the building and entangled him in the tarpaulin. Engel rode the roof down. Furry was caught under some of the steel purlins and pinned therein.

The relevant provisions of the contract between the architects and the school district were as follows:

"The Architect agrees to perform, for the above named work, professional services as hereinafter set forth.

\* \* \*

"The Parties hereto further agree to the following conditions:

"1. *The Architect's Services:* The Architect's professional services consist of the necessary conferences, the preparation of preliminary studies, working drawings, specifications, large scale and full size detail drawings, for architectural, structural, plumbing, heating, electrical, and other mechanical work; obtaining approval of governmental agencies having jurisdiction over certain phases of the work consisting of Fire Marshal, Health Department, County Superintendent of Schools, and Department of Education; assistance in the drafting of forms of proposals and contracts; the issuance of Certificates of Payment; the keeping of accounts, and the general administration of the construction contracts, and supervision of the work.

\* \* \*

"6. *Supervision of the Work:* The Architect will endeavor to guard the Owner against defects and deficiencies in the work of the contractors, but he does not guarantee the performance of their contracts. The supervision of an Architect is to be distinguished from the continuous personal superintendence to be obtained by the employment of a clerk-of-the-works.

"When authorized by the Owner, a clerk-of-the-works acceptable to both Owner and Architect shall be engaged by the Architect at a salary satisfactory to the Owner, and paid by the Owner, upon presentation of the Architect's monthly statements."

The construction contract between Fisher-Stoune, Inc. and the school district provided, in its relevant parts, as follows:

"Article 1. *Scope of the Work.*

"The General Contractor shall furnish all of the materials and perform all of the work to complete the General work shown on the drawings and described in the specifications entitled 'Second Addition to Maroa High School, Community Unit School District No. 2, Macon & DeWitt Counties, Illinois'.

\* \* \*

"Article 6. *The Contract Documents.*

"The General Conditions of the Contract, the Specifications and the Drawings, together with this Agreement, form the Contract, and they are as fully a part of the Contract as if attached or herein repeated.

"12. *Protection of Work and Property.*

"The Contractor shall continuously maintain adequate protection of all his work from damage and shall protect the owner's property from injury or loss arising in connection with this Contract. He shall make good any such damage, injury or loss, except such as may be directly due to errors in the Contract Documents or caused by agents or employees of the Owner, or due to causes beyond the Contractor's control and not to his fault or negligence. He shall adequately protect adjacent property as provided by law and the Contract Documents.

"The Contractor shall take all necessary precautions for the safety of employees on the work, and shall comply with all applicable provisions of Federal, State, and Municipal safety laws and building codes to prevent accidents or injury to persons on, about or adjacent to the premises where the work is being performed. He shall erect and properly maintain at all times, as required by the conditions and progress of the work, all necessary safeguards for the protection of workmen and the public and shall post danger signs warning against the hazards created by such features of construction as protruding nails, hoists, well holes, elevator hatchways, scaffolding, window openings, stairways and falling materials; and he shall designate a responsible member of his organization on the work, whose duty shall be the prevention of accidents. The name and position of any person so designated shall be reported to the Architect by the Contractor.

\* \* \*

"13. *Inspection of Work:*

"The Architect and his representatives shall at all times have access to the work wherever it is in preparation or progress and the Contractor shall provide proper facilities for such access and for inspection.

"If the specifications, the Architect's instructions, laws, ordinances or any public authority requires any work to be specially tested or approved, the Contractor shall give the Architect timely notice of its readiness for inspection, and if the inspection is by another authority than the Architect, of the date fixed for such inspection, required certificates of inspection being secured by the Contractor. Inspections by the Architect shall be promptly made, and where practicable at the source of supply. If any work should be covered up without approval or consent of the Architect, it must, if required, by the Architect, be uncovered for examination at the Contractor's expense.

\* \* \*

"14. *Superintendence: Supervision:*

"The Contractor shall keep on his work, during its progress, a competent superintendent and any necessary assistants, all satis-

factory to the Architect. The superintendent shall not be changed except with the consent of the Architect, unless the superintendent proves to be unsatisfactory to the Contractor and ceases to be in his employ. The superintendent shall represent the Contractor in his absence and all directions given to him shall be as binding as if given to the Contractor. Important directions shall be confirmed in writing to the Contractor. Other directions shall be so confirmed on written request in each case.

"The Contractor shall give efficient supervision to the work, using his best skill and attention. He shall carefully study and compare all drawings, specifications, and other instructions and shall at once report to the Architect any error, inconsistency or omission which he may discover, but he shall not be held responsible for their existence or discovery.

\* \* \*

"15. *Changes in the Work:*

\* \* \*

"In giving instructions, the Architect shall have authority to make minor changes in the work, not involving extra cost, and not inconsistent with the purposes of the building, but otherwise, except in an emergency endangering life or property, no extra work or change shall be made unless in pursuance of a written order from the Owner signed or countersigned by the Architect, or a written order from the Architect, stating that the Owner has authorized the extra work or change, and no claim for an addition to the contract sum shall be valid unless so ordered.

\* \* \*

"19. *Correction of Work Before Final Payment:*

"The Contractor shall promptly remove from the premises all work condemned by the Architect as failing to conform to the Contract, whether incorporated or not, and the Contractor shall promptly replace and re-execute his own work in accordance with the Contract and without expense to the Owner and shall bear the expense of making good all work of other contractors destroyed or damaged by such removal or replacement.

\* \* \*

"38. *Architect's Status:*

"The Architect shall have general supervision and direction of the work. He is the agent of the Owner only to the extent provided in the Contract Documents and when in special instances he is authorized by the Owner so to act, and in such instances he shall, upon request, show the Contractor written authority. He has authority to stop the work whenever such stoppage may be necessary to insure the proper execution of the Contract.

"As the Architect is, in the first instance, the interpreter of the conditions of the Contract and the judge of its performance, he shall side neither with the Owner nor with the Contractor, but

shall use his powers under the contract to enforce its faithful performance by both.

\* \* \*

"39. *Architect's Decisions:*

"The Architect shall, within a reasonable time, make decisions on all claims of the Owner or Contractor and on all other matters relating to the execution and progress of the work or the interpretation of the Contract Documents.

"The Architect's decisions, in matters relating to artistic effect, shall be final, if within the terms of the Contract Documents.

"Except as above or as otherwise expressly provided in the Contract Documents, all the Architect's decisions are subject to arbitration.

\* \* \*

"55. *Protection:*

\* \* \*

"*Bracing, Shoring and Sheeting:* The Contractor shall provide all bracing, shoring and sheeting as required for safety and for the proper execution of the work, and have same removed when the work is completed.

\* \* \*

"VII-2. *Scope of the Work:*

\* \* \*

"*Standards:* All steel shall be designated, fabricated, and erected in accord with the specifications for the Design, Fabrication, and Erection of Structural Steel for Buildings, as amended to date, and the Code of Standard Practice, latest edition, as adopted by the American Institute of Steel Construction, Inc., unless herein specified to the contrary, in which case these specifications shall govern and supersede the standards.

\* \* \*

"VII-20. *Shoring and Alterations:* Existing structural steel shall be carefully shored and braced as required for installation of new connecting steel. Existing truss reused shall be carefully removed, revised and re-erected as called for. Provide new connections for existing trusses and other structural steel members as required by new work."

It appears that the parties agree that architects must exercise reasonable care in the performance of their duties and may be liable to persons who may foreseeably be injured by their failure to exercise such care, regardless of privity.

The principal question is the extent of the architect's duties. It is clear from the evidence that the architects did not prepare detailed specifications for the temporary shoring

of the gymnasium roof, nor did they compute on the plans the load that would be placed upon the shores, or provide the contractor with a safety factor to be used in the shoring. It also appears that the architects did not oversee and inspect the shoring as used.

As we view the record a finding of negligence on the part of the architects must be based upon one or more of these omissions. As a general rule it has been said that the general duty to "supervise the work" merely creates a duty to see that the building when constructed meets the plans and specifications contracted for. *Clinton* v. *Boehm,* 124 N.Y.S. 789, 139 App. Div. 73; *Garden City Floral Co.* v. *Hunt,* 126 Mont. 537, 255 P.2d 352, 356; *Day* v. *National U.S. Radiator Corp.* 241 La. 288, 128 So. 2d 660, 666.

In the present case, however, despite the argument of the architects that the shoring here was a method or technique of construction over which they had no control, we believe that under the terms of the contracts the architects had the right to interfere and even stop the work if the contractor began to shore in an unsafe and hazardous manner in violation of its contract with the owner. Thus, the contract between the owner and the architects provides that the latters' duties include "the general Administration of the construction contract and supervision of the work" (par. 1); "general supervision and direction of the work" (par. 38); and gives them "the authority to stop the work whenever such stoppage may be necessary to insure the proper execution of the contract" (par. 38). The pertinent portions of the contract between the owner and Fisher-Stoune, Inc. provide that the latter "shall take all necessary precautions for the safety of employees on the work" (par. 12) which include the providing of "all bracing, shoring and sheeting as required for safety and for the proper execution of the work" (par. 55). Further, "existing structural steel shall be carefully shored and braced for installation of new connecting steel. Existing truss reused shall be care-

fully removed, revised and re-erected as called for * * *"
(par. VII-20). We agree with the architects that they had
no duty to specify the method the contractor would use in
shoring, but we believe that under the terms of these con-
tracts the architects had the right to insist upon a safe and
adequate use of that method. *Cf. Charles Meads & Co.* v.
*City of New York*, 181 N.Y.S. 704, 706.

The specific allegations of negligence charged against
the architects in each of the common-law counts are that
they:

"(a) Negligently and carelessly failed to provide for
adequate support for the roof of said gymnasium prior to
having the structural supports therefor removed;

"(b) Negligently and carelessly failed to calculate a
sufficient safety factor to be used in the scaffolding under
said roof;

"(c) Negligently and carelessly failed to oversee and
inspect the scaffolding as used to determine whether or not
it was safe to use;

"(d) Otherwise negligently and carelessly failed to apply
to the work aforesaid the degree of skill which would custo-
marily be brought to such work by competent architects in
and about this community."

At the close of all the evidence the architects moved that
each of these specific allegations be withdrawn from the
consideration of the jury, which motion was denied by the
trial court.

As to allegations (c) and (d): From a careful exam-
ination of the record we conclude that if the architects
knew or in the exercise of reasonable care should have
known that the shoring was inadequate and unsafe, they
had the right and corresponding duty to stop the work
until the unsafe condition had been remedied. (*Erhart* v.
*Hummonds*, 232 Ark. 133, 334 S.W.2d 869.) If the archi-
tects breached such a duty they would be liable to these
plaintiffs who could foreseeably be injured by the breach.

Here it appears that the shoring and removal of part of the old gymnasium roof was a major part of the entire remodeling operation and one that involved obvious hazards. We think that the shoring operation was of such importance that the jury could find from the evidence that the architects were guilty of negligence in failing to inspect and watch over the shoring operation. *Cf. Day* v. *National U.S. Radiator Corp.* 241 La. 288, 128 So. 2d 660.

Turning next to the counts alleging a violation of the Structural Work Act, (Ill. Rev. Stat. 1963, chap. 48, pars. 60, 69,) the architects contend that the shoring was not within the purview of the act, that there is no evidence that the shores were inadequate, and that the architects were not "in charge of the work," so as to be liable for plaintiffs' injuries. We have examined the record and we find that the opinion of the appellate court adequately disposes of the first two contentions holding that the shoring was within the purview of the act and could be found to have been inadequate.

We also believe that what we heretofore have said regarding the architects' right to stop the work if it were being done in a dangerous manner makes them persons "having charge" within the meaning of the act. (*Larson* v. *Commonwealth Edison Co.* 33 Ill.2d 316.) We therefore conclude that the trial court did not err in refusing to direct a verdict for defendants on the statutory counts.

In view of our determination with respect to allegations (c) and (d) of each of the common-law counts and all of the Structural Work Act counts, it will be unnecessary to discuss allegations (a) and (b) of the common-law counts. Section 68(4) of the Civil Practice Act (Ill. Rev. Stat. 1965, chap. 110, par. 68(4)) provides: "If several grounds of recovery are pleaded in support of the same demand, whether in the same or different counts, an entire verdict rendered for that demand shall not be set aside or reversed for the reason that any ground is defective, if one or more

of the grounds is sufficient to sustain the verdict; nor shall the verdict be set aside or reversed for the reason that the evidence in support of any ground is insufficient to sustain a recovery thereon, unless before the case was submitted to the jury a motion was made to withdraw that ground from the jury on account of insufficient evidence and it appears that the denial of the motion was prejudicial."

Examination of the special form of verdict returned by the jury indicates that the architects were found liable under both the common-law counts and the Structural Work Act counts. Since we have held that the jury could have properly found liability to exist under allegations (c) and (d) of the common-law counts and under the Structural Work Act counts, we do not believe prejudice is present even if allegations (a) and (b) of the common-law counts charge omissions not properly within the ambit of the architects' duty to plaintiffs, which we do not here determine. See *Olson* v. *Kelly Coal Co.,* 236 Ill. 502, 504.

We therefore conclude that the trial court did not err in refusing to direct verdicts for defendant architects.

We are further of the opinion that the appellate court's disposition of the arguments concerning (1) the examination of one Ronald Slater, (2) the propriety of one of plaintiffs' instructions, and (3) questions as to the excessiveness of the verdicts is adequate and correct.

We next consider the propriety of the trial court's dismissal of the architects' third-party complaint against the contractor before the presentation of evidence. The purpose of a third-party action is to permit the determination of the rights and liabilities of all parties before a single tribunal and upon the same evidence. *Blaszak* v. *Union Tank Car Co.* 37 Ill. App. 2d 12; Ill. Rev. Stat. 1963, chap. 110, par. 25(2); Historical and Practice Notes to S.H.A., chap. 110, par. 25.

The trial court should not have dismissed the third-party complaint unless it appears from the pleadings that in no

event would the architects have an action over against the contractor. The contractor insists that such lack of potential recovery is apparent because the contractor cannot be liable for more than workmen's compensation benefits to its employees, and also that it appears that the architects are active wrongdoers who can have no action over in either a scaffolding or negligence case.

The plaintiffs were employees of the contractor, Fisher-Stoune, were injured in the course of their employment and were paid benefits, and therefore could not bring an action directly against their employer. Therefore to allow this third-party action would make Fisher-Stoune liable indirectly where they would not be liable directly. The third-party defendant argues that such a result is precluded by sections 5 and 11 of the Workmen's Compensation Act. (Ill. Rev. Stat. 1963, chap. 48, pars. 138.5, 138.11.) Section 11 provides that compensation under the act, "shall be the measure of the responsibility" of a covered employer. Section 5 provides: "No common law or statutory right to recover damages from the employer or his employees for injury or death sustained by any employee while engaged in the line of his duty as such employee, other than the compensation herein provided, shall be available to any employee who is covered by the provisions of this Act, to anyone wholly or partially dependent upon him, the legal representatives of his estate, or any one otherwise entitled to recover damages for such injury."

This question is admittedly not an easy one to answer. One authority on workmen's compensation has called it "the most evenly balanced controversy in all of workmen's compensation law * * *." 2 Larson, Workmen's Compensation Law, par. 76.10 (1961).

The argument of the contractor is not without merit, for, in consideration of limited liability under the workmen's compensation laws, employers have given up many of their prior rights  However, we feel that the argument

in favor of allowing a third party who was not actively negligent to obtain indemnification from an employer who was actively negligent is the better view. The employee's workmen's compensation recovery is not admissible as evidence in an employee's action against a third party. (*Bryntesen* v. *Carroll Construction Co.*, 27 Ill.2d 566). Thus, if the employee succeeds in this action, he is allowed two recoveries, one from the third party based on a common-law measure of damages. To prevent a windfall when this occurs, section 5(b) of the Workmen's Compensation Act (Ill. Rev. Stat. 1965, chap. 48, par. 138.5(b)) provides:

"Where the injury or death for which compensation is payable under this Act was caused under circumstances creating a legal liability for damages on the part of some person other than his employer to pay damages, then legal proceedings may be taken against such other person to recover damages notwithstanding such employer's payment of or liability to pay compensation under this Act. In such case, however, if the action against such other person is brought by the injured employee or his personal representative and judgment is obtained and paid, or settlement is made with such other person, either with or without suit, then from the amount received by such employee or personal representative there shall be paid to the employer the amount of compensation paid or to be paid by him * * *." Since the employee's recovery in his action against the third party will ordinarily exceed his workmen's compensation award, when the employer utilizes section 5(b) he will be fully indemnified. Consequently, unless a third party who has not been guilty of active negligence can succeed in an action against an employer who has been guilty of active negligence, the third party will be made to bear the ultimate burden of a loss which should fall on the employer. We say this because, while Illinois does not allow contribution among joint tort-feasors, it does allow a passively negligent tort-feasor to obtain indemnification from

an actively negligent tort-feasor. *Griffiths & Son Co.* v. *National Fireproofing Co.* 310 Ill. 331; *Chicago and Illinois Midland Railway Co.* v. *Evans Const. Co.* 32 Ill.2d 600.

It should be noted that in *Griffiths* there was an express indemnification agreement, whereas here there is none. However, there are several appellate court decisions specifically recognizing the propriety of indemnification in cases where the indemnitor has paid workmen's compensation to an injured workman even though no express indemnification agreement existed. (*Krambeer* v. *Canning,* 36 Ill. App. 2d 428; *Boston* v. *Old Orchard Business District, Inc.,* 26 Ill. App. 2d 324; *Moroni* v. *Intrusion-Prepakt, Inc.,* 24 Ill. App. 2d 534). We agree with the rationale of these cases, and thus feel that it is proper to recognize the right of indemnity, even in the absence of a specific agreement providing therefor.

We are cognizant of many cases from other jurisdictions which construe their particular compensation acts as precluding such an action over. However, we are also aware that the provisions of our act are subject to constant scrutiny by the legislature. Since there has been no clarification of the intent of the legislature since the holdings of the appellate courts, we adopt their reasoning and hold that the act does not bar a third party from seeking indemnity from the employer who has paid compensation under the act. *Bell* v. *South Cook County Mosquito Abatement District,* 3 Ill.2d 353; *Modern Dairy Co.* v. *Department of Revenue,* 413 Ill. 55.

However, even if this be so, the contractor insists that since the original complaint and the third-party complaint contain similar allegations of negligence, there can be no indemnity over between two active wrongdoers. We do not agree with this conclusion. While the original complaint does contain allegations of active wrongdoing, this does not constitute the sole basis for liability on the part of the architects. As we have suggested before, the jury could have

properly based their verdict on the failure of the architects to stop work or prevent the contractor from performing its duties in an unsafe manner. If the jury could properly find that an injury was directly caused by improper construction methods and techniques used by a contractor, and, as we hold, that the architect was liable only by reason of a failure to stop work on the job, we think that the jury could find that the contractor was an active tort-feasor while the architect's fault was merely passive. (*Chicago and Illinois Midland Railway Co.* v. *Evans Const. Co.* 32 Ill.2d 600, 604-5.) Nor does our earlier determination herein that the architects were properly found liable to plaintiffs under the Structural Work Act alter our disposition with regard to the third-party action. While, in *Gannon* v. *Chicago, Milwaukee, St. Paul and Pacific Ry. Co.,* 22 Ill.2d 305, this court has held that liability under the Structural Work Act properly attaches only to those "having charge of" the operation or construction who have wilfully violated the provisions of the act, this does not mean that persons found liable thereunder are necessarily active wrongdoers. (Wilfully means knowingly (*Gannon*), and a person will be deemed to have known that which he reasonably should have known. (*Schultz* v. *Ericsson Co.,* 264 Ill. 156.)) We agree with the language of the appellate court in *Rovekamp* v. *Central Const. Co.,* 45 Ill. App. 2d 441, 449, where it is stated that "[a]lthough the liability imposed by the [Structural Work] Act does not rest upon negligence, there can be degrees of fault among those who, under the Act, are accountable to an injured plaintiff. Who is the more culpable, a party who supervises and coordinates the overall project, or a party who is responsible for the scaffolding and the particular work which produced the injury? Both are in charge of the work, to be sure, but of different phases of the work. Neither can escape liability to the [injured] plaintiff—thus the purpose of the Act is accomplished—but the lesser delinquent, if held accountable

by the plaintiff, can transfer its statutory liability to the active delinquent, whose dereliction from duty brought about plaintiff's injury."

We accordingly conclude that this is a proper case for a third-party complaint and that the trial court erred in dismissing the architect's third-party complaint on motion without presenting the issue to the jury. (*Griffiths & Son Co.* v. *National Fireproofing Co.,* 310 Ill. 331; *Blaszak* v. *Union Tank Car Co.,* 37 Ill. App. 2d 12; *Palmer House Co.* v. *Otto,* 347 Ill. App. 198; *Banks* v. *Central Hudson Gas & Electric Corp.,* 224 F.2d 631 (2d Cir.); *Shell Oil Co.* v. *Foster-Wheeler Corp.,* 209 F. Supp. 931.) On the present state of the record it is therefore necessary to remand this cause for a trial to determine the respective rights and liabilities of the architects and the contractor *inter se.*

With respect to plaintiffs' cross appeal from the judgments entered on the verdicts for the defendant school district owner, we agree with the appellate court that there was a disputed question of fact as to whether the school district could be deemed to have been in charge of the erection and construction under the Structural Work Act so as to make it liable to the plaintiffs. We further agree with the appellate court that, based upon all the evidence, such verdict was not contrary to the manifest weight of the evidence.

For the foregoing reasons, the judgment of the trial court in favor of the plaintiffs and against the defendants, DeWitt and Amdal, is affirmed. The judgment in favor of Fisher-Stoune, Inc., and against the third-party plaintiff, DeWitt and Amdal, is reversed and the cause is remanded for a trial on such action. The judgment for Maroa Community School District No. 2 and against the plaintiffs is affirmed.

*Affirmed in part and reversed in part and remanded.*

Mr. JUSTICE HOUSE, dissenting:

I am constrained to dissent from the majority. As the

opinion notes at the outset, the case "presents a novel issue of first impression before this court." It concedes that a finding of negligence on the part of the architects must either be based upon their failure to prepare more detailed specifications for the shoring or their failure to oversee and inspect the shoring method used. The opinion apparently is bottomed on the latter. It imposes a legal duty on an architect not only to prepare plans and specifications, but to inspect the methods employed by the contractor leading up to completion under the general inspection clause of his contract.

I cannot read into the contract a duty which is not imposed by it. The architect's contract used here is a more or less standard form generally used by architects and engineers. It provides for detailed plans and specifications, obtaining approval of various governmental agencies, issuing certificates of payment and general administration. Supervision is limited. The architect contracts to attempt prevention of defects but specifically disclaims a guarantee of the performance by the contractor.

The continuous form of supervision envisioned by the majority opinion is neither contemplated by, nor given under, such a contract. When continuous supervision is required by the owner it is customary for a clerk-of-the-works (resident inspector) to be selected by the owner and architect and paid by the owner. This contract has such a provision and specifically provides that the architect's supervision "is to be distinguished from the continuous personal superintendence to be obtained by the employment of a clerk-of-the-works."

Again, the opinion concedes that architects have no duty to specify the method used to accomplish the finished building, but the belief was stated that the architects "had the right" to insist upon a safe and adequate use of that method. True, but to parlay that "right" into a duty is neither consistent with generally accepted usage nor contemplated by

the contract. Obviously, the architect did not contract to be present or represented at all phases of construction and he should not be held responsible for methods used by the contractor which may result in injury. Since there is no contractual obligation, liability is fixed by an expansion of the common law.

I find no support for such a radical departure in either this or any other jurisdiction. The cases cited for comparison are usually between contractor and architect or owner and architect, but not for liability of an architect to an employee of the contractor. The general view is stated in *Garden City Floral Co.* v. *Hunt,* 126 Mont. 537, 255 P.2d 352, 357: "To say that he [architect] must supervise the method of doing the work before there is full supervision would place the architect in an entirely different role from that of an architect. * * * As a matter of law the courts recognize that an architect merely supervises the results and does not dictate the methods when not controlled by the specifications."

There are sound reasons for the prevailing view that the architect's primary duty is to provide a sound completed structure in accordance with the owner's requirements, but not to dictate the methods by which the contractor attains that objective. There would be utter chaos if the contractor or his superintendent were to give an order to use his most efficient equipment and personnel, and the architect attempted to countermand and order that the work be done by another method requiring different equipment and skills. When a contractor bids a job he expects to use his equipment and the special talents and experience of his organization. If the threat existed that the details of carrying out his contract be subject to outside interference, contractors naturally would take that into consideration in fixing their bids. If the duty of architects is expanded to require that they be on the job at all times and prescribe methods of construction or be held liable for the negligence of employees of the contractor,

they will reflect the added burden in their supervision fees. All of this adds up to an additional and, I think, unnecessary and unwarranted financial burden upon the public without a commensurate benefit. Liability of architects as imposed here is economically unsound.

The huge construction industry in this country has functioned very well without the imposition of liability upon architects and engineers who design, but do not build, structures and other facilities. I see no justification for extending the common law to place liability on architects.

Mr. JUSTICE KLINGBIEL joins in this dissent.