FRANK URMAN, Plaintiff-Appellee, *v.* FRED WALTER *et al.*, d/b/a Vermont Street Investments, Defendants-Appellants.

First District (5th Division)    No. 79-2471

Opinion filed November 13, 1981.

1086

Schaffenegger, Watson and Peterson, Ltd., of Chicago (Donald G. Peterson, of counsel), for appellants.

Anesi, Ozmon, Lewin & Associates, Ltd., of Chicago (Maureen A. Mitchel and Curt N. Rodin, of counsel), for appellee.

Mr. JUSTICE WILSON delivered the opinion of the court:

Following a jury trial, defendants were found liable to plaintiff under the Structural Work Act. (Ill. Rev. Stat. 1979, ch. 48, par. 60.) The trial court entered judgment against defendants in the amount of $83,232.50 for injuries plaintiff suffered when a 600-pound steel truss fell on his leg. Defendants appeal, contending that (1) the Structural Work Act is inapplicable to the circumstances of this case; (2) the trial court erred in preventing defendants from amending their answer to plead that plaintiff was their employee, which may have constituted a defense under the Workmen's Compensation Act (Ill. Rev. Stat. 1979, ch. 48, par. 138.5); (3) the judgment should be reversed because of plaintiff's counsel's prejudicial closing argument; and (4) the trial court abused its discretion in allowing plaintiff's expert witness to testify after he had failed to give defendants his deposition. We affirm the trial court.

Plaintiff, a structural ironworker, was injured on September 21, 1974, while he was working at a construction site in Palatine, Illinois. The individual defendants owned Vermont Street Investments, which was the general contractor for the construction project. Defendant Walter took the most active role as general contractor for the erection of the structural steel, scheduling and coordinating the steel erection. As general contractor in charge, he was also responsible for safety on the job site.

Walter had originally hired Jim's Welding Service to erect the steel columns, beams, and trusses into a grid so that the roof decking could be laid. By the day of the occurrence, however, Jim's Welding had only partly completed the work and could not continue. Walter therefore contacted another ironworker, Lenny Aftstein, who worked for Corbetta Steel Company, and arranged for him and his co-workers, including plaintiff, to finish the job on a weekend.

When plaintiff and the other ironworkers arrived at the site, the

perimeter and partition brick walls of the building were completed. The interior ground had been filled with gravel, clay, and unrefined sand, which had been graded once before the masonry work was begun. The roof trusses, which were to be placed on top of the beams, were outside the building when the ironworkers arrived. They moved them inside with a crane and placed them directly on the ground. At that time, the ground was bumpy and full of ruts because it had been used by forklifts, trucks, and cranes after being graded once.

In the early afternoon of the day of plaintiff's injury, a heavy rain fell and stopped the ironworkers for approximately 30 minutes. Shortly after the rain ceased, the men returned to work. Plaintiff and Herman Johnson, the ironworker's foreman, began the necessary procedures to lift the trusses in place on the roof beams. Just before the accident, Johnson and plaintiff were preparing to attach a choker or sling around one of the trusses so that they could hook the other end onto the crane that would lift it into place. Suddenly, several trusses fell over and pinned plaintiff to the ground, breaking his ankle. He was taken to a hospital for treatment.

Plaintiff filed suit against defendants on October 17, 1975, seeking $200,000 in damages for his injuries.

In October of 1979, the trial began. Plaintiff first called defendant as a witness under section 60 of the Civil Practice Act (Ill. Rev. Stat. 1979, ch. 110, par. 60). Walter admitted that he was the general contractor in charge of safety on the job site. He testified that he was familiar with the practice of using cribbing or wood supports to stabilize trusses. He also testified that plaintiff was not his employee.

Plaintiff then presented three witnesses who testified as to the customs and practice of the ironworking industry with respect to the support of trusses on job sites. Herman Johnson, the foreman, was an ironworker with 24 years of experience. He stated that the "normal procedure" was to put the trusses on four-by-four planks of lumber to make them level and prevent them from rolling. Johnson further testified that when he asked defendant Walter for lumber to be used for such support, he was told that there was none available.

James Finney, an ironworker with 12 years experience, also testified from his personal knowledge that the custom and practice in the ironworking industry was to support trusses with heavy lumber to support and stabilize them. He further testified that the general contractor is the party responsible for providing such cribbing.

In addition to the other two witnesses, Charles Schultz testified for plaintiff, over defense objections, as an expert on industry practices. His experience included a total of 10½ years as a safety inspector for State and Federal government agencies. At the time of trial, Schultz worked as a construction safety consultant for general contractors. In his opinion, based on plaintiff's counsel's hypothetical, the trusses had been placed on

unstable ground without sufficient support and created a dangerous situation that violated the rules and general practices of the construction industry. He further testified that four-by-fours, four-by-sixes, or railroad ties should have been used as cribbing for the trusses, to protect the workers.

Dr. Robert W. Alfini, plaintiff's treating physician, described the injury and the surgical procedures used to repair plaintiff's broken ankle. He also testified that plaintiff wore a leg cast for approximately 12 weeks. Subsequently, he underwent physical therapy. By the time of trial, although the break had healed, plaintiff still suffered from some permanent damage to the soft tissue surrounding the fracture. He continued to suffer pain upon prolonged activity and changes in the weather.

After plaintiff rested, defendants moved for leave to amend their answer to plead the affirmative defense that plaintiff was defendants' employee. They proposed to show that since plaintiff collected unemployment compensation from defendants, he was barred from suing them under the Structural Work Act. Plaintiff objected on the grounds that such an amendment was untimely. Further, he argued that defendant Walter's admission that plaintiff was not his employee was a binding admission on that issue. The court allowed defendants to file the motion for the record but denied leave to amend the pleadings to add the affirmative defense.

Defendants then called the court reporter who had been present during plaintiff's deposition on July 21, 1977. She read portions of the deposition into the record.[1]

At the close of their case, defendants moved for a directed verdict, which was denied. The jury was instructed, following counsels' closing arguments, and they returned a verdict in favor of plaintiff.

OPINION

### I

The principal issue of this appeal involves the scope of section one of the Structural Work Act, which provides:

> "[A]ll scaffolds, hoists, cranes, stays, ladders, supports, or other mechanical contrivances, erected or constructed by any person, firm or corporation in this State for the use in the erection, repairing, alteration, removal or painting of any house, building, bridge, viaduct, or other structure, shall be erected and constructed, in a safe, suitable and proper manner, and shall be so erected and constructed, placed and operated as to give proper

---

[1] Plaintiff had suffered a loss of memory, at time of trial, because of a medical condition that was unrelated to his leg injuries. Accordingly, the trial court permitted defendant to introduce as evidence certain portions of plaintiff's deposition.

and adequate protection to the life and limb of any person or persons employed or engaged thereon, or passing under or by the same, and in such manner as to prevent the falling of any material that may be used or deposited thereon." Ill. Rev. Stat. 1979, ch. 48, par. 60.

The Structural Work Act is designed to protect workers engaged in extrahazardous activities from certain risks inherent in the nature of their jobs. (*E.g., Halberstadt v. Harris Trust & Savings Bank* (1973), 55 Ill. 2d 121, 302 N.E.2d 64; *Crist v. Debron Corp.* (1981), 96 Ill. App. 3d 668, 421 N.E.2d 997.) Although the Act should be liberally construed (*McNellis v. Combustion Engineering, Inc.* (1974), 58 Ill. 2d 146, 317 N.E.2d 573), it is not intended to cover all injuries that may occur on or near a construction site. *Crafton v. Lester B. Knight & Associates, Inc.* (1970), 46 Ill. 2d 533, 263 N.E.2d 817.

The elements of a cause of action under section one include the following: (1) the device involved must be one listed in the Act; (2) the device involved must be used in the construction of a building or "other structure" within the Act; (3) the device must be unsafe, or not safely placed or operated (or there must be the failure to provide such a device); (4) defendants (those who are "in charge of" the work) must have "wilfully" violated the Act; and (5) plaintiff's injury must be proximately caused by defendants' violation. (Ring, *The Scaffold Act: Its Past, Present and Future*, 64 Ill. B. J. 666, 670 (1976).) The pending appeal involves only the first element, whether the cribbing that should have been placed under the trusses is a device that is covered by the Act.

Defendants argue that there is no "scaffold" in this case and no duty to provide one. In essence, they equate the words "hoists, cranes, stays, ladders, supports, or other mechanical contrivances" with the word "scaffold," which they contend is a term of art with a restricted meaning. Defendants strongly urge us to hold that, for purposes of Structural Work Act liability, the scaffold must be used only for the purpose of supporting workers. If a device is used for any other purpose, it would not be a scaffold and thus would not come within the coverage of the Act. Since plaintiff in this case was standing on the ground, defendants argue, he was not using a scaffold. Nor would cribbing or other "supports" for the trusses constitute a scaffold within the Act's meaning because the purpose of such cribbing would be to support the trusses, not the workers.

■■ We agree with defendants that "scaffold" is a term of art limited to devices or platforms used to support persons as they work on buildings or other structures covered in the Act. We further agree that as a matter of statutory construction, the terms "scaffold, hoists, cranes, stays, ladders, supports, or other mechanical contrivances" are related in meaning and purpose. Nevertheless, if we construe the other terms as exact synonyms

of "scaffold," thereby limiting them to supports for workers only, we judicially erase terms that the legislature thought important enough to include.[2] Such a result is illogical and unnecessary. Indeed, as at least one court has explicitly recognized, "[t]hat a particular item involved in the construction work may not be a 'scaffold' within the customary definition of 'scaffold' does not mean it may not be a hoist, crane, stay, ladder, support, or other mechanical contrivance, within the purview of the Act. The Act is not limited to what are customarily referred to as 'scaffolds.' " *Miller v. DeWitt* (1965), 59 Ill. App. 2d 38, 127, 208 N.E.2d 249, 291, *aff'd in part, rev'd in part* (1967), 37 Ill. 2d 273, 226 N.E.2d 630.[3]

Notwithstanding the *DeWitt* determination, defendants persist in their belief that case law has narrowed the scope of the Act to the point that all support devices must function as scaffolds; that is, provide a working platform for persons. Before discussing specific cases, however, we will first examine the specific language of the statute, which "itself affords the best means of its own exposition * * *." *Oldham v. Kubinski* (1962), 37 Ill. App. 2d 65, 85, 185 N.E.2d 270, 279.

By its terms, section one provides that all "scaffolds, hoists, cranes, stays, ladders, supports, or other mechanical contrivances" used in constructing, or maintaining buildings or "other structures" should be erected, placed and operated so as to protect "persons employed or engaged thereon, *or* passing under or by the same, *and* in such manner as to prevent the falling of any material that may be used or deposited thereon." (Emphasis added.) Two categories of persons are thus protected, those who are actually working on the support device and those who pass by or under the same. Such persons are protected from at least two types of injury-causing possibilities, the collapse or other failure of support device (*i.e.*, one that is not safely erected, placed, or operated), and the falling of "any material" that may be used or deposited on the device.[4] The next logical inference from the statutory language would be

---

[2] A dictionary definition of scaffold is "a temporary platform used by workers in the construction, repair, or cleaning of a building." (American Heritage Dictionary of the English Language 1157 (1969).) In comparison, two of the definitions of "support" are "to bear the weight of, especially from below," and "to hold in position to prevent from falling, sinking, or slipping." (American Heritage Dictionary, at 1293.) A definition of "stay" is "support or brace." (American Heritage Dictionary, at 1260.) It is apparent that while a scaffold has a support function and a support may be used as a scaffold, the terms are not necessarily interchangeable.

[3] To avoid confusion, we will only use the term "scaffold" to indicate a platform or device used to support workers—its customary meaning. When referring to the terms enumerated in section one collectively, we adopt the generic phrase "device" or "support device."

[4] In *Bennett v. Musgrave* (1970), 130 Ill. App. 2d 891, 266 N.E.2d 128, one of the few cases involving falling materials, the court held that a worker could recover for injuries suffered when a wrench fell from a scaffold and struck him. In so holding, the court rejected defendant's argument that a wrench, as a tool, was not "material" within the meaning of the Act. *Bennett*, 130 Ill. App. 2d 891, 894-95, 266 N.E.2d 128, 131.

that to effectuate the protective purpose of the Act, the failure to provide a necessary support device would be as much a violation of section one as the provision of a faulty support device, because the resulting harm would be the same in both situations. In fact, the Illinois Supreme Court has so construed the Act. *Louis v. Barenfanger* (1968), 39 Ill. 2d 445, 236 N.E.2d 724 (failure to provide scaffolding can violate the Act); see also *Crothers v. La Salle Institute* (1977), 68 Ill. 2d 399, 370 N.E.2d 213.

■■ In the pending case, plaintiff does not argue that he was actually standing or working on a support device. He was, concededly, on the ground. He would presumably be within the second category of protected persons, therefore, because of his proximity to the trusses. Consequently, his recovery under the Act would depend on whether there was a duty to provide a support device for the trusses, the absence of which proximately caused his injury when the trusses fell on his leg. The evidence is uncontradicted that the industry practice is for the general contractor to provide the cribbing for trusses. Defendant Walter admitted as much, and plaintiff's expert witnesses testified that such cribbing served to protect workers from injury. Two other witnesses agreed that the industry practice was to support the trusses with heavy lumber. The jury decided the fact question of whether defendants breached their duty under the Act and that plaintiff was injured as a result. We would therefore affirm their verdict on the basis of the evidence and our reading of the statute.

Having considered the statutory language and its apparent applicability to the facts of this case, we must next determine whether the case law has in fact narrowed the scope of the Act, as defendants insist. One of the principal cases that defendants rely upon is *Swendsen v. Brighton Building & Maintenance Co.* (1976), 41 Ill. App. 3d 930, 355 N.E.2d 164.

In *Swendsen,* the court held that the Structural Work Act did not apply where a worker fell off steel pilings that he was walking upon. The pilings could not be converted into a "scaffold" merely because he chose to walk on them for his own convenience. As the court observed, "[p]laintiff failed to establish that he had no alternative except to walk on the piling to get from one end to the other." (*Swendsen,* 41 Ill. App. 3d 930, 933, 355 N.E.2d 164, 166.) In conclusion, the court stated that under the circumstances, allowing defendant to recover under the Act "would permit an employee to stand or walk wherever he wishes and, if he is off the ground, his choice becomes a scaffold." *Swendsen,* 41 Ill. App. 3d 930, 933, 355 N.E.2d 164, 166.

Although defendants contend that *Swendsen* is so analogous to the instant case as to compel our reversal of the plaintiff's judgment, we cannot agree. Our case does not involve the question of whether the surface on which plaintiff was standing when he was injured was a

scaffold. Nor does he attempt to turn the trusses themselves into a scaffold, as did the *Swendsen* plaintiff. Clearly, the issue resolved in *Swendsen* has no bearing on the question of whether the lack of cribbing in the instant case is actionable under the statute.

*Swendsen* is an example of the many Structural Work Act cases in which the main issue to be resolved was whether a particular item could be characterized as a scaffold. The courts have used a functional analysis to determine this question. For example, a permanent part of a building, such as a roof, is not generally viewed as a scaffold; however, if a worker is using the roof to support him as he works, he may recover for injuries under the Act. (See *Louis v. Barenfanger* (1968), 39 Ill. 2d 445, 236 N.E.2d 724.) Similarly, a floor is not a scaffold when it is being used merely as a walkway (*Tenenbaum v. City of Chicago* (1975), 60 Ill. 2d 363, 325 N.E.2d 607; *Quinn v. L. B. C., Inc.* (1981), 94 Ill. App. 3d 660, 418 N.E.2d 1011), but if a worker relies on a partially completed floor for support as a working platform, he may recover. (*Juliano v. Oravec* (1973), 53 Ill. 2d 566, 293 N.E.2d 897 (plumber's apprentice injured when his foot slipped through an unfinished subflooring that supported workers as they installed bathroom plumbing in a partially constructed house).) A device that is expressly listed in the Act, such as a crane, may also be considered to be a scaffold (*Bounougias v. Republic Steel Corp.* (7th Cir. 1960), 277 F.2d 726 (painter standing on the drum of a crane to reach ceiling of a building, who was injured when the drum rotated, stated a cause of action under the Act), but a bulldozer used to clear trees from a power line site is not a scaffold or "mechanical contrivance" (*Matthews v. Commonwealth Edison Co.* (1980), 90 Ill. App. 3d 1024, 414 N.E.2d 147; see also *Crafton v. Lester B. Knight & Associates, Inc.* (1970), 46 Ill. 2d 533, 263 N.E.2d 817 (worker who fell off a tractor while hauling steel to a job site was not within the coverage of the Act because the tractor was being used for transportation, not "support")).

In their reliance on this group of "scaffold cases," defendants mistakenly assume that the *sole* relevant inquiry under the Act is whether the injury-causing device can be classified as a working platform for persons. Only one case that we have found, *Matthews v. Commonwealth Edison Co.*, appears to agree with defendants' position. In *Matthews* the plaintiff, who was clearing trees in preparation of the laying of power lines, was injured when a tree he had uprooted fell on his arm. The court rejected plaintiff's argument that the bulldozer he was driving at the time was a "mechanical contrivance" within the Act. The *Matthews* opinion contains the broad statement that "[t]o come under the Act's coverage, a case must feature harm caused by a failure of something a worker is using to support *himself*. Where that feature is missing there can be no liability under the statute." (Emphasis added.) (*Mathews*, 90 Ill. App. 3d 1024, 1025, 414

N.E.2d 147.) This declaration is not followed by any citations. Nor can we find any cases that so hold. We agree with the *Matthews* court's finding that the bulldozer was not being used in the sense of a scaffold and that the term "mechanical contrivance" should not be used to cover every vehicle or device that a worker happens to be on when he is injured. (See *Crafton v. Lester B. Knight & Associates, Inc.* (1970), 46 Ill. 2d 533, 263 N.E.2d 817.) Nevertheless, we find unpersuasive the implication that, to come within the Structural Work Act, all support devices are limited by the scaffold concept. Indeed, the reasoning of three Illinois Supreme Court decisions indicates otherwise.

In *Miller v. DeWitt* (1965), 59 Ill. App. 2d 38, 208 N.E.2d 249, *aff'd in part, rev'd in part* (1967), 37 Ill. 2d 273, 226 N.E.2d 630, ironworkers who were remodeling a gymnasium were injured when the roof collapsed. The workers had erected tubular steel towers to temporarily support the roof while they removed the original support columns. At the time the roof collapsed, one worker was on the roof and another was cutting a support column off at the bottom in preparation of disconnecting it from the roof trusses. Although the case involved several different issues, the appellate court discussed at length the question of whether a support device within the Act must be, in effect, a scaffold. The court held that the tubular steel columns which were erected to temporarily support the roof (not to be a working platform for persons) were, literally, "supports" and possibly "stays" or "other mechanical devices" erected for use in the construction or alteration of a building within the Act's meaning. (59 Ill. App. 2d 38, 127, 208 N.E.2d 249, 291.) The supreme court expressly adopted the appellate court's reasoning in this issue. 37 Ill. 2d 273, 286, 226 N.E.2d 630, 639.

In *Navlyt v. Kalinich* (1972), 53 Ill. 2d 137, 290 N.E.2d 219, a worker who was installing sewer tiles in a trench was killed when the walls of the trench collapsed on him. The supreme court held that the complaint stated a cause of action under the Structural Work Act. One of the allegations was that the absence of some type of "lateral stays, supports, shorings, or other mechanical contrivances" in the trench proximately caused the worker's death. Defendants' motion to dismiss the complaint, however, was premised on the belief that the trench was not a "structure" within the meaning of the Act. The supreme court adopted the appellate court's phrasing of the sole issue before it as whether the decedent, at the time the trench collapsed on him, was working on or about a " 'house, building * * * or other structure' " within the meaning of section one. (53 Ill. 2d 137, 138, 290 N.E.2d 219, 220.) The supreme court held that the sewer system was an integral part of the building being constructed at the site and consequently found that the decedent had been working "on or about a structure." The court went on to cite *Louis v. Barenfanger* (1968),

39 Ill. 2d 445, 236 N.E.2d 724, for the rule that "failure to provide scaffolding can be the basis for a cause of action under the Structural Work Act." The court also cited *Miller v. DeWitt*, stating that the *DeWitt* decision "specifically approved the holding * * * that shoring is within the purview of the Act and a cause of action may be based on the inadequacy of the shores provided." 53 Ill. 2d 137, 139, 290 N.E.2d 219, 220.

In *McNellis v. Combustion Engineering, Inc.* (1974), 58 Ill. 2d 146, 317 N.E.2d 573, a man was fatally injured when a 20,000 pound metal pedestal fell on him as he was unloading it from a railroad car. The pedestals were to be transported to the site of a power generating facility being built approximately one-half mile away. A judgment was entered upon a jury verdict in favor of plaintiff. On appeal, the defendant argued, among other things, that the unloading of equipment was not an activity subject to the Structural Work Act. In rejecting this contention, the supreme court discussed the existence of a contract which indicated that the task of erecting machinery at the power station would necessitate the incidental tasks of unloading and storage. Further, the contract defined the premises of the construction as including all places contiguous to or in the vicinity of the place where the work was to be done. Accordingly, the court held that the unloading activity in question constituted "erection of any building or other structure" within the meaning of the Act. In addition to this discussion, the court cited testimony that a crane should have been used to hold the pedestals in place while the workers cut the metal pieces that secured them to the railroad car.

■■ Like the situations in *McNellis* and *Navlyt*, the instant facts involve the failure to provide a support device. The crane mentioned in *McNellis*, if properly used, would have functioned as a support for materials, not workers. The shoring that was not provided in *Navlyt* likewise would have functioned as "stays" or "supports" rather than scaffolds. Therefore, even though *McNellis* and *Navlyt* were primarily concerned with another aspect of the Act, the reasoning of both cases supports plaintiff's position. More directly on point is the *DeWitt* court's recognition that "supports" and "stays" need not function as "scaffolds" to be within the scope of the Structural Work Act. This holding controls on the statutory construction issue involved in the pending case.

■■ ■ As a final comment, we emphasize that our decision does not broaden the existing coverage of the Act, despite defendants' insinuation to the contrary. The scaffold cases will continue to be governed by the pertinent authorities previously discussed. When a person is injured by the failure of *any* support device the courts must determine whether the injury is directly related to the specific, extrahazardous risks that the Act was designed to prevent. Thus, if a person trips over a ladder rather than falls off of it, he probably will not be able to claim a Structural Work Act

violation because his injury has no connection with the hazardous nature of the ladder. (See *Tenenbaum v. City of Chicago* (1975), 60 Ill. 2d 363, 371, 325 N.E.2d 607, 613.) Similarly, the worker who falls off steel pilings that are not meant to be scaffolds or other support devices does not state a claim under the Act. (*Swendsen.*) But where, as here, the injured party in the performance of his work is struck by unsupported trusses, he can recover if the jury determines from the evidence that he was proximately injured by the defendants' failure to provide such supports in violation of the Act.

## II

Defendants next argue that the trial court erroneously denied their motion for leave to amend their answer. They attempted to plead an affirmative defense, following the close of plaintiff's case, based on section 5(a) of the Workmen's Compensation Act. This section provides, in pertinent part:

> "No common law or statutory right to recover damages from the employer * * * for injury or death sustained by any employee while engaged in the line of his duty as such employee * * * is available to any employee who is covered by the provisions of this Act * * *." (Ill. Rev. Stat. 1977, ch. 48, par. 138.5(a).)

The Workmen's Compensation Act applies to the construction industry (Ill. Rev. Stat. 1979, ch. 48, par. 138.3); hence, plaintiff's cause of action presumably would be defeated by defendants' affirmative defense under section 5(a).[5] The trial court, however, denied as untimely defendants' motion for leave to plead the defense. Defendants now contend that this was an abuse of discretion because plaintiff had notice of the defense as early as 1978, when defendants raised the employment issue in their motion for judgment. Accordingly, defendants believe that plaintiff has waived his right to challenge their failure to plead the defense. We disagree.

■■ There is no absolute right to amend pleadings; the timeliness of such a request is a discretionary determination by the trial court. (*United Air Lines, Inc. v. Conductron Corp.* (1979), 69 Ill. App. 3d 847, 387 N.E.2d 1272.) Under the circumstances of the instant case, we find no abuse of discretion. The trial court did consider that plaintiff was not "totally surprised" by the Workmen's Compensation defense. We do not believe,

---

[5] In certain contexts, the employer's immunity provision may not bar the injured party from bringing a Structural Work Act lawsuit against his employer. (See *Sharp v. Gallagher* (1981), 94 Ill. App. 3d 1128, 419 N.E.2d 443.) This exception to employer immunity, called the dual capacity doctrine, is discussed in the recent Illinois Supreme Court decision of *McCormick v. Caterpillar Tractor Co.* (1981), 85 Ill. 2d 352, 423 N.E.2d 876.

however, that defendants can properly rely on plaintiff's awareness of the potential defense as an excuse for their failure to affirmatively plead it. Hence, we reject their theory that plaintiff had the duty to challenge the sufficiency of their answer (which did not plead the defense) when defendants moved for judgment in April of 1978; there was no affirmative pleading for plaintiff to attack by a motion to strike. Although defendants raised the employment issue at that time, they never attempted to amend their answer before trial. It was not until after plaintiff had completed his case in chief that they first filed for leave to amend.

While the amendment of pleadings is to be liberally granted, we believe that the trial court carefully considered the circumstances in making its ruling. The record indicates that defense counsel had several opportunities to argue his position to the court outside of the jury's presence. Thus, the trial court's ultimate decision to deny defendants' amendment, jury instruction, and special interrogatory on the employment issue is supported by the record and was not an abuse of discretion. Therefore, we will not disturb the court's ruling on this issue.

In light of our holding, we need not consider whether defendant Walter's twice-repeated statements that plaintiff was not his employee should be considered conclusively binding on him as a judicial admission.

## III

Finally, defendants raise two alleged trial errors as grounds for reversal. First, they object to certain remarks that plaintiff's counsel made in his closing argument. In discussing the reasonableness of the requested $83,000 in damages, counsel stated that he had tried many cases and that "this [$83,000] is a very low figure for an injury of this type * * *." Also, defendants object to plaintiff's implication, made during his rebuttal, that the reason the defense attorney did not mention damages in his closing argument was because he knew "that is a reasonable figure." Defendants contend that these remarks were improper and may have influenced the jury to return an excessive verdict.

■■ We note that the above remarks were made in the context of a lengthy discussion of plaintiff's injuries. While we do not believe that references to other claims are appropriate, counsel's remarks to the effect that $83,000 was low for "this type" of case are not so damaging as to require reversal. Moreover, defendants failed to object to this comment, which may be viewed as a waiver. (*Chloupek v. Jordan* (1977), 49 Ill. App. 3d 809, 817, 364 N.E.2d 650.) Nor do we find that the brief reference to defense counsel's failure to argue damages rises to the level of reversible error. Defendants elected to stand on the liability issue and refrain from arguing damages. In adopting this tactic, they incurred an attendant risk that the jury would find plaintiff's unrebutted sum persuasive. Attorneys are

accorded substantial latitude in their closing arguments (*Goldstein v. Hertz Corp.* (1973), 16 Ill. App. 3d 89, 305 N.E.2d 617), and a verdict will not be set aside on the basis of improper remarks unless they are so prejudicial as to fatally infect the jury's decision. We conclude from our examination of the transcripts the challenged remarks fall short of the reversible error standard. See *Patur v. Aetna Life & Casualty* (1980), 90 Ill. App. 3d 464, 413 N.E.2d 65.

## IV

Defendants' last point of error involves the alleged impropriety of the court's allowing Charles Shultz to testify for plaintiff. The basis of their objection is that they were deprived of the opportunity to depose him before trial. As a result, they contend, they were unfairly surprised by his expert testimony.

The record does not support this claim. On the Friday before the trial began, plaintiff's counsel told the defense attorney that he might call Mr. Shultz to testify at trial. He had not considered hiring him before that time. The following Monday and Tuesday Shultz was out of town. On Wednesday, the third day of trial, plaintiff received word that Shultz was to undergo surgery and would not be available to testify after 2 o'clock that afternoon. Plaintiff consequently asked the court for permission to call Shultz as his expert witness. Defendant objected because he had not had the opportunity to depose him. Although the trial court then offered defense counsel time to interview Shultz before he testified, counsel declined.

■■ In view of these circumstances, we cannot say that the trial court abused its discretion in allowing Shultz to testify. See *Dickeson v. Baltimore & Ohio Chicago Terminal R.R. Co.* (1965), 73 Ill. App. 2d 5, 220 N.E.2d 43, *aff'd* (1969), 42 Ill. 2d 103, 245 N.E.2d 762; *Burns v. West Chemical Products, Inc.* (1973), 12 Ill. App. 3d 947, 956, 299 N.E.2d 455.

Additionally, we note that Shultz's testimony regarding the industry's safety standards was merely cumulative because two other witnesses had previously testified as to the custom and practice of supporting trusses with heavy lumber. Consequently, defendants were not surprised or prejudiced by the trial court's decision to permit Shultz to testify.

For the foregoing reasons, we affirm the trial court's judgment entered on the jury verdict against defendants in the amount of $83,232.50.

Affirmed.

SULLIVAN, P. J., and MEJDA, J., concur.