**Gault H. Holt, et al., Plaintiffs-Appellees, v. A. L. Salzman & Sons, a Corporation, Defendant-Appellant.**

Gen. No. 49,430.

First Judicial District.

September 20, 1967.

Rehearing denied November 10, 1967.

L. Louis Karton, of Chicago, for appellant.

Philip H. Corboy, James P. Chapman, and John D. Hayes, of Chicago, for appellees.

GOLDENHERSH, J.

Defendant, A. L. Salzman & Sons, a corporation, appeals from judgments entered in the Circuit Court of Cook County in favor of plaintiffs, Gault H. Holt, Fred Fanter and George Cady in the amounts of $16,250, $5,000, and $26,250, respectively, in their suits to recover for personal injuries. Plaintiffs, who are sheet metal workers, were engaged in laying metal sheets on the joists of a building then being constructed, when the joists collapsed, and plaintiffs fell and were injured.

Originally, in addition to the defendant, A. L. Salzman & Sons, Milton H. Callner, d/b/a Milton H. Callner & Company, Milton H. Callner, Inc., a corporation, Ceco Steel Products Corporation, and LaSalle National Bank, as Trustee under Trust No. 13411, were named as parties defendant. Neither the record nor the abstract shows when and in what manner the defendant, LaSalle National Bank, was dismissed from the case. On October 3, 1962, the court entered an order nunc pro tunc as of October 1, 1962, which provided:

"This matter coming before the court on motion of the plaintiffs, the court being fully advised in the premises,

"It Is Hereby Ordered that these consolidated causes be, and hereby are, dismissed without costs and with prejudice as to Milton H. Callner, d/b/a Milton H. Callner & Company, Milton H. Callner, Inc., a corporation, and Ceco Steel Products Corporation, a corporation, only; and without prejudice to the causes of action proceeding as against A. L. Salzman & Sons, Inc., a corporation."

Plaintiffs were then given leave to file, and filed instanter, their fourth amended complaint, naming the defendant, A. L. Salzman & Sons, a corporation, as the sole party defendant. The case proceeded to trial and the jury returned verdicts in favor of the plaintiffs in the amounts of $25,000, $7,500 and $40,000, respectively.

In its answer, and again in its post-trial motion, defendant alleges, and plaintiffs admit, that the defendants who were dismissed from the case have paid plaintiffs a total of $25,000. Upon denying the post-trial motion the court entered judgments in the above amounts, the figures being computed by reducing each verdict by the amount received by the plaintiff from the dismissed defendants.

Defendant contends that the payments by the dismissed defendants and the dismissal, with prejudice, of the cases against them, constituted a release of those defendants, and served to release all joint tortfeasors. Although the parties refer to "Covenants to Terminate Litigation" executed by plaintiffs in connection with the payments, no such documents appear in the record.

In support of its argument defendant cites Aiken v. Insull, 122 F2d 746 (CA 7th), Bryan v. Creaves, 138 F2d 377 (CA 7th) and Petroyeanis v. Pirola, 205 Ill App 310. That Aiken and Bryan are clearly distinguishable from this case is best demonstrated by the opinion written by Judge Kerner (also the author of Aiken) in Essington v. Parish, 164 F2d 725, wherein at page 729, he said: "However conflicting the authorities may be in respect to the proper construction of the instruments here involved, we think the law is now settled in Illinois that the substance of the agreement is the controlling factor, and that the essential fact to be determined is 'what was the intention of the parties.' Illinois looks to all the circumstances to determine whether or not the transaction was intended as, and was in substance, a settlement and satisfaction, or merely an agreement not to sue, and that, as was held in City of Chicago v. Babcock, supra, 143 Ill 367, 32 NE 271, is a question of fact. The Aiken v. Insull and Bryan v. Creaves cases, supra, are not opposite. In the Aiken case this court held that in substance (actual intent) as well as in form (language employed) the instrument constituted a release, while in the Bryan case, supra, 138 F2d 377, 378, the agreement recited that they (the parties) were ' "desirous of composing and compromising their differences" and that the contract should constitute "a full settlement of claims between the parties hereto, accruing up to this date" '." With respect to Petroyeanis, we can add nothing to the language found in Van Meter v.

Gurney, 251 Ill App 184, 186–187, and quoted in Hulke v. International Mfg. Co., 14 Ill App2d 5, 142 NE2d 717.

■ ■ Applying the rule as stated in Essington that the "essential fact to be determined is 'what was the intention of the parties,' " we hold that the order entered by the trial court shows clearly and unequivocally that it was the intention of the parties not to release plaintiffs' claims, but to terminate the pending litigation and desist from further proceedings, and the entry of the order of dismissal did not serve to bar plaintiffs' claims against the defendant.

Plaintiffs' fourth amended complaint is in two counts. In Count I they allege that defendant is a corporation engaged in the business and profession of architecture, that it was engaged by the dismissed defendants Callner to draw plans, specifications and drawings for a building and to "check, revise and approve" plans, specifications and drawings prepared by the dismissed defendant, Ceco Steel Products Corporation, and did so, that for the purpose of approving the work prior to payments to the subcontractor it was also engaged to check and inspect the performance of certain portions of the work including the erection of certain joists, and that plaintiffs were injured as the result of the collapse of the joists. This count charges defendant with 17 acts of negligence which will be enumerated and discussed to the extent necessary to this opinion. Plaintiffs also allege their freedom from contributory negligence.

In Count II plaintiffs allege that the defendant wilfully failed to provide and design proper, sufficient and adequate bar joists and bridging, failed to provide for the erection of said joists and bridging in a safe manner, failed in their plans, specifications and drawings to provide for proper and adequate stays, supports, joists and bridging, that it wilfully approved or designed plans for the joists without provision for proper intermediate supports, and wilfully approved or designed plans for

joists which were inadequate to bear, in addition to the dead load, a live load of 50 pounds for every square foot, and that the foregoing constitute wilful violations of the Structural Work Act (c 48, §§ 60–69, Ill Rev Stats).

The evidence shows that Milton H. Callner, individually, or one of the Callner corporations, owned a parcel of land upon which a one-story commercial building was being erected. One of the Callner corporations acted as general contractor, and the Callner organization also had an architect in its employ. Defendant, a corporation engaged in the practice of architecture, was consulted by Callner, and there is no dispute that it prepared a substantial portion of the plans for the building, including the general layout and the plans for the columns, joists and roof decking. Defendant contends that Callner's employee-architect was the architect on the project, that its assignment was merely to do the "overflow" drawings, and it had no responsibility for seeing that the building was constructed in accordance with the plans and specifications. The record reflects neither a written contract between the defendant and Callner, nor any contract between the Callner-owner entity and the general contractor.

Callner entered into a contract with one Paul Arra to erect steel beams and bar joists which Callner had purchased from Ceco Steel Products Corporation, and to erect a steel roof deck with materials purchased from the same source. Defendant furnished Callner with architectural plans without details or specifications, and Arra employed a structural engineer to prepare the detailed plans. These detailed plans were delivered to Callner, and the evidence shows that the purchase order to Ceco Steel Products Corporation was based upon these detailed plans approved by defendant in its capacity as architect.

The contract between Callner and Arra which was prepared by defendant, required Arra to perform the work in accordance with plans "prepared by A. L. Salzman &

311

Sons, Architect," and the provisions for payment, in two instances, provide for final payments to be made "after completion of such work and approval by the Architect."

The testimony shows that in erecting the building, the distance between the columns was to be 44 feet, and the span between the horizontal steel beams upon which the roof deck was to be constructed, was 20 to 21 feet. The joists are described as being fabricated of steel bars with open steel angles between the bars.

The top of the joist is referred to as a flange and the bottom as the chord.

The plans called for the steel bar joists to be spaced at intervals of 7 feet. The plans also provided for "clear top" bridging which is described as a steel member placed perpendicular, and attached to the flange of the joist by means of a bolt or a shop welded stud. The purpose of bridging is to prevent the joists from twisting.

Chapter 69 of the Code of the City of Chicago contains the following provisions:

> "69–4. The regulations, specifications, standards and tests of the technical organizations which are referred to in this code are hereby incorporated herein by such reference with the same effect as though set forth. Authenticated copies of all such regulations, specifications, standards and tests shall be kept on file in the office of the commissioner of buildings, available for public inspection and use.

> "69–4.1. The following shall be deemed to represent, for the purposes of this code, accepted engineering practice with respect to the materials, equipment, systems and methods of construction respectively specified therein, except as otherwise specifically provided in this code or in any regulation adopted pursuant hereto."

312

The Manual of the Steel Joist Institute is designated in the ordinance as the standard specification for steel joist construction (69–4.1(f) Steels and Metals. Standard Specification for Steel Joist Construction).

The Steel Joist Institute Manual, to which the ordinance refers, contains the following provisions:

"SECTION 100. SCOPE

. . . . . .

"(b) 'Steel Joist Construction' as governed by these specifications shall be that type of construction where decks and top slabs, as defined in Section 109 of these specifications, are supported by separate steel members herein referred to as 'steel joists', spaced not farther apart than twenty-four (24″) inches on centers in floors and thirty (30″) inches on centers in roofs, but in no case spaced farther apart than the safe span of the top slab, deck or flooring over said steel joists.

"(c) Where steel joists are used at wider spacings than specified in paragraph (b) of this Section, the construction shall not be considered as 'Steel Joist Construction' as defined in these specifications. Such steel joists shall be designed, however, in accordance with recognized engineering practice without exceeding the unit stresses specified herein."

. . . . . .

"SECTION 101. DEFINITION OF STEEL JOIST

"Any open web steel member suitable for supporting floors and roofs between the main supporting girders, trusses, beams or walls when used as hereinafter specified shall be known as a 'steel joist'. Such steel joists may be made of hot or cold formed sections, strip or sheet steel, riveted or welded together, or by expanding."

. . . . . .

313

"SECTION 108. BRIDGING

"(a) As soon as steel joists have been erected, bridging shall be installed between them before the application of construction loads. This bridging shall be adequate to safely support the top chords or flanges against lateral movement during the construction period and shall hold the steel joists in an approximately vertical plane passing through the bearings.

. . . . . .

"(d) If continuous horizontal bridging is used, it shall consist of not less than two one-half (½") inch round continuous steel bars. Each bridging line shall consist of one bar at top chords and one bar at bottom chords attached by welding at points of contact with each Open Web Steel Joist. The welding process must not damage the joist members.

"(e) The number of lines of bridging provided shall not be less than that specified in the following table:

| Span | Number of Lines of Bridging |
| --- | --- |
| Up to 14 feet—One row near center. | |
| 14 to 21 feet—Two rows placed at approximately ¼ span apart and symmetrically disposed about the center of span. | |
| 21 to 32 feet—Three rows placed at approximately ¼ points of span." | |

. . . . . .

Arra testified that prior to and at the time of the occurrence, the work was being done in accordance with the plans. He stated that he had furnished the owner "an extra heavy steel" rather than furnishing steel designed to the bare minimum, in that he had substituted beams which weighed 124 pounds to the foot for the

314

beams provided for in the plans, which weighed 108 pounds to the foot. Over objection, he testified that after the accident the number of joists was doubled. Prior to the occurrence, the joists used were number 147 Ceco bar joists, spaced at 7-foot intervals. Afterward provision was made to instal number 127 Ceco joists midway between the 147 joists, also at 7-foot intervals, so that the spacing was reduced from 7 feet, to 3 feet 6 inches, between joists. He described the 147 joist as a 14-inch joist, and the 127 as a 12-inch joist.

Defendant's officers testified that under the terms of its employment by Callner defendant was not required to furnish any supervision on the job, that Callner ran his own job, and defendant's services were fully performed upon approval of the plans above described. They also testified that although no such qualification appears in the approval shown on the plans, defendant approved only the spacing and length of the joists, and not the details. "Details" are defined as explaining the types and sizes of materials and where they are to be placed, more fully than do the plans. Their plans did not designate the location of the bridging.

Defendant's president testified that good architectural practice would be to put bridging lines at third points in a 20 or 21-foot span. He stated that although the Manual of the Steel Joist Institute did not show single bar bridging attached to the top flange of steel bar joists as an approved type of bridging, it did not mean that it was not approved or adequate for the type of construction here involved. He identified the bridging shown in a photograph of the structure as horizontal bridging. He stated that horizontal bridging as detailed in the Manual of the Steel Joist Institute required horizontal supports affixed to the top flange and to the bottom chord of steel bar joists.

The testimony is conflicting as to the number of times defendant's architects were at the job site, and the

purpose of their being there. The witness, upon being asked if he went out to the job site from time to time, answered: "I would go out to the bar joists to establish that work was completed." Upon being asked: "And that was for the purpose of allowing a payout on the job, is that correct?", answered "Yes."

Defendant's secretary-treasurer, who is an architect and a licensed engineer, testified that the purpose of bridging is to prevent twisting and torque.

Dr. John Hinckley, a physicist, and operator of a research and testing laboratory, called as an expert witness for plaintiffs, testified that in his opinion the design for the erection and bridging of the bar joists was not adequate to prevent roll over or torsion stress in the bottom chord or bar of the joists.

Alex Alexander, a licensed structural engineer called by defendant, testified that in his opinion the bridging shown in the plans was satisfactory.

Frank Wells, a licensed structural engineer called by defendant, expressed the opinion that the design for the spacing of the joists and the bridging was satisfactory.

Plaintiffs testified that they were employed to instal the roof decking. The decking material was corrugated steel sheets, 18 inches wide, but there is a variation in the testimony as to their weight and length. One of the plaintiffs described the sheets as being 20 feet in length and weighing 20 pounds, while Arra stated that each sheet was 14 feet long and weighed 50 pounds. Plaintiffs had laid a number of sheets in the morning and had lifted several bundles of the material up on the deck. There were 3 or 4 stacks of 20 to 30 sheets each on the deck when they stopped for their lunch break. Plaintiff, Cady, foreman on the job, testified that the procedures described were the same as those followed on all the other jobs on which he had worked.

After the crew returned from lunch, they went back up on the deck. Suddenly the metal sheets and the underlying joists collapsed, and plaintiffs fell to the ground.

The witnesses are in agreement that the joists have their greatest weight bearing capacity and strength while in a vertical plane, and their capacity and strength decrease as they deviate from the vertical. During the construction period there are lateral loads placed on the joists by virtue of the movement of workmen and materials. The Chicago Code requires that a building be designed to support its "dead load" which includes the joists, the decking and the roofing material to be placed on the decking, and a "live load" of 25 pounds per square foot. Once installed, the decking serves as bridging. The testimony here shows that although some of the decking had been laid it had not been welded to the joists.

Howard J. Richter, District Manager for Ceco Steel Products, testified that he went out to the job shortly after the occurrence, that there were no weld marks on the beam in the area where the joists collapsed, the interior bearing beam on which the joists were resting had a narrower top flange than the beam adjacent to it, and the bridging was spaced more than 11 feet apart which is not in accordance with the recommendations of the Institute or Ceco.

With respect to Count I defendant contends (a) the evidence fails to show that the plans drawn or approved by defendant were defective or improper, (b) that there is no evidence of improper architectural or engineering practice, (c) that even if the plans contained defects, there is no evidence that the plans were followed or that the defects were the proximate cause of plaintiff's injuries, (d) that even if the plans contained defects which proximately caused the injuries, the evidence does not show that defendant failed to exercise the ordinary skill of its profession in approving such plans, (e) the court erred in admitting Arra's testimony, over defendant's objection, as to changes made after the occurrence, in the spacing and number of the joists.

317

Because it goes to the question of whether plaintiff has proved the elements of a submissible case, we shall first consider defendant's contention (d). In Count I of their fourth amended complaint plaintiffs charged defendant with negligence, it answered, and the case was tried on an ordinary negligence theory, and not on the professional malpractice theory of liability which defendant now contends is applicable. In Benson v. Isaacs, 22 Ill2d 606, at 610, 177 NE2d 209, the Supreme Court said: "The law is clear that the theory upon which a case is tried in the lower court cannot be changed on review, and that an issue not presented to or considered by the trial court cannot be raised for the first time on review. In re Estate of Leichtenberg, 7 Ill2d 545." The rule applies here and defendant's contention (d) comes too late.

In Count I plaintiffs charge, inter alia, that defendant carelessly and negligently (a) designed portions of the structure, (b) approved the design and method of erection of certain joists and bridging, (c) failed to specify proper and adequate bridging, (d) approved specifications for joist spacings of 7 feet, (e) approved plans and designs which failed to meet the requirements of the Chicago Code, (f) failed to inspect the work. Assuming, arguendo, that defendant had no duty under the terms of its employment to supervise or inspect the work, the evidence reviewed is sufficient to support a finding that defendant was negligent either in preparing or approving plans which failed to provide for adequate bridging and proper joist spacing, and which did not meet the standards set by the Chicago Code and the Manual of the Steel Joist Institute, that the plans were followed, and defendant's negligence was the proximate cause of plaintiffs' injuries.

Defendant contends that the testimony of its expert witnesses shows that the bridging approved by defendant represented good architectural and engineering practice,

318

and was in accord with what was customarily done in the construction of other buildings. In Darling v. Charleston Community Memorial Hospital, 33 Ill2d 326, 211 NE2d 253, in considering a similar contention, the Supreme Court, at page 331, said: "Custom is relevant in determining the standard of care because it illustrates what is feasible, it suggests a body of knowledge of which the defendant should be aware, and it warns of the possibility of far-reaching consequences if a higher standard is required. (Morris, Custom and Negligence, 42 Colum L Rev 1147 (1942) ; 2 Wigmore, Evidence, 3rd ed secs 459, 461.) But custom should never be conclusive. As Judge Learned Hand said, 'There are, no doubt, cases where courts seem to make the general practice of the calling the standard of proper diligence; we have indeed given some currency to the notion ourselves. . . . Indeed in most cases reasonable prudence is in fact common prudence; but strictly it is never its measure; a whole calling may have unduly lagged in the adoption of new and available devices. It never may set its own tests, however persuasive be its usages. Courts must in the end say what is required; there are precautions so imperative that even their universal disregard will not excuse their omission'. The T. J. Hooper, (2d cir 1932) 60 Fed2d 737, 740."

With respect to defendant's contention (e), that the trial court erred in its ruling with respect to Arra's testimony, the record shows that when plaintiffs' counsel asked the question of which defendant now complains, the following ensued:

"Defendant's counsel: Objection.
"The Court: Overruled."

The record reflects no further objection and there is no motion to strike the testimony. In defendant's post-trial motion the only reference to alleged errors in the admission of evidence is the charge that "The court

erred in admitting incompetent and prejudicial evidence proffered by the plaintiffs over the objection of the defendant."

It is the rule in Illinois that a general objection raises only the questions of relevancy and materiality, Johnson v. Bennett, 395 Ill 389, 69 NE2d 899. The question, and the answer it elicited, involved changes made in the spacing and number of the bar joists after the occurrence. We need not decide whether, upon proper specific objection, the testimony should have been excluded, and under the holding in Larson v. Commonwealth Edison, 33 Ill2d 316, 211 NE2d 247, the evidence was both relevant and material. We hold that the question was not properly preserved for review for the reason that the post-trial motion does not meet the statutory requirement that grounds for new trial be specified with particularity. Lawler v. Pepper Const. Co., 33 Ill App2d 188, 195, 178 NE2d 687.

As to Count II, defendant contends that (a) there is no instrumentality involved which would subject defendant to liability under the Structural Work Act, and (b) the manifest weight of the evidence shows that defendant had no supervisory function at the job site. Defendant argues that "there is no evidence in this record that any 'scaffolds, hoists, cranes, stays, ladders, supports or other mechanical contrivances' were involved in the plaintiffs' injuries." Defendant further contends that defendant cannot be held liable under the Structural Work Act because the manifest weight of the evidence shows that defendant was not in charge of the work.

In Miller v. DeWitt, 37 Ill2d 273, 226 NE2d 630, the liability of the architects, and in Larson v. Commonwealth Edison Co., 33 Ill2d 316, 211 NE2d 247, the charges of violation of the Structural Work Act on the part of the defendant engineers, were based upon the fact that they exercised control which placed them, along with others, in charge of the work and imposed upon

them liability under the Structural Work Act. In this case plaintiffs proceeded on a theory different from that of Miller and Larson, and the cases are therefore clearly distinguishable.

■ Although the Structural Work Act is more frequently referred to as the "Scaffold Act" its provisions are applicable to facets of structural work other than equipment and contrivances included in the generic term, "scaffold." The sections pertinent here are sections 2 and 8 which provide:

> "(2) If in any house, building or structure in process of erection or construction in this state (except a private house, used exclusively as a private residence), the distance between the enclosing walls, is more than twenty-four (24) feet, in the clear, there shall be built, kept and maintained, proper intermediate supports for the joists, which supports shall be either brick walls, or iron or steel columns, beams, trussels (trusses) or girders, and the floors in all such houses, buildings or structures, in process of erection and construction, shall be designed and constructed in such manner as to be capable of bearing in all their parts, in addition to the weight of the floor construction, partitions and permanent fixtures and mechanisms that may be set upon the same, a live load of fifty (50) pounds for every square foot of surface in such floors, and it is hereby made the duty of the owner, lessee, builder or contractor or sub-contractor, of such house, building or structure, or the superintendent or agent of either, to see that all the provisions of this section are complied with."

> . . . . . .

> "(8) It shall be the duty of all architects or draftsmen engaged in preparing plans, specifications or

321

drawings to be used in the erection, repairing, alter-
ing or removing of any building or structure within
the terms and provisions of this act to provide in
such plans, specifications and drawings for all the
permanent structural features or requirements speci-
fied in this act; and any failure on the part of any
such architect or draftsmen to perform such duty,
shall subject such architect or draftsmen to a fine
of not less than twenty-five (25) dollars nor more
than two hundred (200) dollars for each offense."

Civil liability for violations of the Act is created in the
fourth paragraph of section 9 which makes no reference
to "having charge of" the work. The term "having
charge of" is found only in the first paragraph of section
9 which provides for criminal penalties. Section 8, which
imposes criminal penalties on architects, contains no
such provision.

We are not required to determine whether to impose
liability based upon an alleged violation of section 8, the
defendant must be proved to "have charge of" the work.
Plaintiffs' Count II does not charge that defendant had
charge of the work, and defendant did not attack the
sufficiency of the complaint. The case was tried, and
the jury instructed, on the basis of an alleged violation
of section 8, without regard to whether defendant was in
charge of the work, and defendant's contention with re-
spect to "scaffolds, hoists, et cetera. . . ." appears for
the first time on appeal. As heretofore stated "the theory
upon which a case is tried in the lower court cannot be
changed on review and an issue not presented to or con-
sidered by the trial court cannot be raised for the first
time on review." Whether defendant "had charge of"
the work is, therefore, not an issue here.

From our examination of the record we conclude that
there is sufficient evidence to support the verdict and

we find no error which warrants reversal. The judgment of the Circuit Court of Cook County is, therefore, affirmed.

Judgment affirmed.

EBERSPACHER and MORAN, JJ., concur.