HAROLD MEYER, Plaintiff-Appellee, v. CATERPILLAR TRACTOR COM-
PANY *et al.*, Defendants and Appellants and Third–Party Plaintiffs-Appel-
lants (Engineered Structural Products, Third–Party Defendant-Appellee).

First District (5th Division)   No. 86—0625

Opinion filed November 14, 1988.—Rehearing denied January 5, 1989.

MURRAY, J., specially concurring.

Johnson, Cusack & Bell, Ltd., of Chicago (Thomas H. Fegan, of counsel), for appellants.

Mark Novak, of Anesi, Ozmon, Lewin & Associates, Ltd., and Paul J. Bargiel, P.C., both of Chicago, for appellee Harold Meyer.

Tribler & Marwedel, P.C., of Chicago (Willis R. Tribler and Douglas C. Crone, of counsel), for appellee Engineered Structural Products, Inc.

JUSTICE PINCHAM delivered the opinion of the court:

Plaintiff, Harold Meyer, brought this action to recover damages for an injury to his knee suffered while working as a millwright for defendant Engineered Structural Products, Inc. (ESP). Plaintiff alleged a violation of the Structural Work Act (Ill. Rev. Stat. 1985, ch. 48, par. 60) and also named as defendants Caterpillar Tractor Company (Caterpillar) and Frazier Manufacturing Corp. (Frazier), which sought indemnity from ESP. The jury awarded $900,000 to plaintiff and found against defendants Caterpillar and Frazier on the indemnity claim. Defendants appeal from this judgment.

On appeal, defendants contend that: (1) plaintiff's cause of action is not authorized under the Structural Work Act (Ill. Rev. Stat. 1985, ch. 48, par. 60); (2) defendants were denied a fair trial by plaintiff's introduction of the opinion testimony of five previously undisclosed expert witnesses on the "unsafeness" of the procedure used in unbundling the storage racks during which plaintiff's injury occurred; and (3) the $900,000 verdict of the jury was grossly excessive for the knee injury sustained by the plaintiff. The facts developed at trial follow.

In 1976, defendant Caterpillar purchased a storage rack system from defendant Frazier. Frazier subcontracted the fabrication, delivery and installation of the racks to defendant ESP. ESP manufactured and installed the rack system. Plaintiff was employed as a millwright for ESP in the installation of the storage rack system at Caterpillar.

On September 8, 1976, plaintiff walked up to a bundle of storage racks sitting on the curb at Caterpillar. Suddenly plaintiff heard a snap and a shout "[I]t's coming at you." The bundle of storage racks began to tip over. Plaintiff tried to move away to avoid the racks falling on him but he fell. Plaintiff's knee hit the curb. Despite plaintiff's attempt to grab the bundle of storage racks, they toppled over and fell on plaintiff's knee and injured it. He was treated at Mercy Cen-

ter's emergency room, where surgery was performed and his leg placed in a cast. Plaintiff remained in the hospital until September 13, 1976, a period of five days.

The defendants argue that plaintiff is not entitled to recovery under the Structural Work Act because: the storage racks that were involved in his injury only supported material and they did not support workmen and the Structural Work Act applies only to structures intended to support workmen and not materials. Defendants additionally argue that even if the Structural Work Act applies to devices intended to support materials, plaintiff still is not entitled to recover for his injuries because the materials which fell on him were placed on the wrong side of the storage racks and not because the storage racks were not properly supported. Defendants also contend that the Structural Work Act as construed and applied by the trial court in this case was so vague and arbitrary that defendants were denied due process. We disagree with each of these contentions by the defendants.

The Structural Work Act (Act) (Ill. Rev. Stat. 1985, ch. 48, par. 60) provides in pertinent part:

> "All scaffolds, hoists, cranes, stays, ladders, supports, or other mechanical contrivances erected or constructed by any person, firm or corporation in this State for the use in the erection, repairing, alteration, removal, or painting of any house, building, bridge, viaduct, or other structure, shall be constructed in a safe, suitable and proper manner, and shall be so erected and constructed, placed and operated as to give proper and adequate protection to the life and limb of any person or persons employed or engaged thereon, or passing under or by the same, and in such manner as to prevent the falling of any material that may be used or deposited thereon."

■■ Illinois courts have held that the purpose of the Structural Work Act is to protect workers who are employed in extrahazardous conditions on the construction site from injury while working on, by, or under scaffolds and other support devices. A violation of the Act may occur from the failure to provide a safe scaffold or support device or the failure to provide any scaffold or support device at all, where one is required. The Act should be liberally construed to effectuate its purpose. *Prange v. Kamar Construction Corp.* (1982), 109 Ill. App. 3d 1125, 441 N.E.2d 889; *Urman v. Walter* (1981), 101 Ill. App. 3d 1085, 428 N.E.2d 1051.

In the present case, the plaintiff was injured because the defendants failed to provide a safe, suitable, and proper support for a bundle of storage racks weighing approximately 2,000 pounds which tipped

over onto plaintiff, causing severe and permanent injury to his left knee. The defendants admit that the plaintiff's injury occurred when the storage racks fell on plaintiff at the construction site. A defense raised by the defendants in their brief is that "[t]he theory of recovery advanced by plaintiff does not as a matter of law authorize recovery under the Structural Work Act." This contention is based upon the defendants' further contention that "[t]he Structural Work Act applies only to devices intended to support workmen" and does not apply to devices which are intended to support materials on the construction site.

●2 These contentions of the defendants' are fallacious. The Structural Work Act is intended to cover support devices used on the construction site whether their purpose is to support workmen or materials. In *Urman v. Walter* (1981), 101 Ill. App. 3d 1085, 428 N.E.2d 1051, this court considered this precise contention raised by the defendants herein and rejected it. In *Urman*, the plaintiff, an ironworker, was injured when a 600-pound steel roof truss, which a fellow worker was attaching to a sling to be hooked on to a crane for lifting to the building roof, fell on plaintiff's leg. In *Urman*, the defendants contended, as do the defendants in the case at bar, that under the Structural Work Act the scaffold or support involved must be one for the support of the workmen and for none other. We there pointed out defendants' contention as follows:

> "Defendants strongly urge us to hold that, for purposes of Structural Work Act liability, the scaffold must be used only for the purpose of supporting workers. If a device is used for any other purpose, it would not be a scaffold and thus would not come within the coverage of the Act. Since plaintiff in this case was standing on the ground, defendants argue, he was not using a scaffold. Nor would cribbing or other 'supports' for the trusses constitute a scaffold within the Act's meaning because the purpose of such cribbing would be to support the trusses, not the workers." (*Urman*, 101 Ill. App. 3d at 1090.)

In rejecting the defendants' contention in *Urman* that the *"sole* relevant inquiry under the Act is whether the injury-causing device can be classified as a working platform for persons" (101 Ill. App. 3d at 1093), this court reviewed the prior decisional law analyzing the Structural Work Act.

The analysis review in *Urman* began with *Matthews v. Commonwealth Edison* (1980), 90 Ill. App. 3d 1024, 414 N.E.2d 147, which held that the Structural Work Act covered only injuries caused by a faulty device used to support workmen. In *Urman*, this court criti-

cized the *Matthews* decision, saying that the declaration in *Matthews* that the Structural Work Act was limited only to cases involving faulty supports for workers was not supported by the citation of any authorities, and there are not any cases which so hold. This court further stated in *Urman* that the rationale employed by the Illinois Supreme Court in Structural Work Act cases contradicted the holding of *Matthews.*

In *Navlyt v. Kalinich* (1972), 53 Ill. 2d 137, also considered and discussed by the court in *Urman,* the support device was a type of "lateral stays, supports, shorings, or other mechanical contrivances" which would have prevented the walls of a trench from collapsing and killing a worker who was installing sewer tiles in a trench. In *McNellis v. Combustion Engineering, Inc.* (1974), 58 Ill. 2d 146, also considered and discussed by the court in *Urman,* the support device was a crane which should have prevented a 2,000-pound metal pedestal from falling on the worker and killing him while he was unloading equipment. In *Urman,* this court observed:

"Like the situations in *McNellis* and *Navlyt,* the instant facts involve the failure to provide a support device. The crane mentioned in *McNellis,* if properly used, would have functioned as a support for materials, not workers. The shoring that was not provided in *Navlyt* likewise would have functioned as 'stays' or 'supports' rather than scaffolds.

Therefore, even though *McNellis* and *Navlyt* were primarily concerned with another aspect of the Act, the reasoning of both cases supports plaintiff's position." (*Urman,* 101 Ill. App. 3d at 1095.)

This court then held in *Urman:*

"[W]here, as here, the injured party in the performance of his work is struck by unsupported trusses, he can recover if the jury determines from the evidence that he was proximately injured by the defendants' failure to provide such supports in violation of the Act." (Emphasis added.) (*Urman,* 101 Ill. App. 3d at 1096.)

Therefore, *Urman* pointedly rejected the defendants' contention in the case at bar that "[t]he Structural Work Act applies only to devices intended to support workmen."

In *Prange v. Kamar Construction* (1982), 109 Ill. App. 3d 1125, 441 N.E.2d 889, this court again followed the holding in *Urman.* In *Prange,* the employee driver of a tractor-forklift was injured when a load of four or five 18-foot-long 500- to 600-pound poles fell off the forklift, which was attached to the front of the tractor, and onto the

driver injuring him. The trial court held, on defendants' motion for summary judgment, that the tractor-forklift was not a mechanical contrivance under the Structural Work Act. On appeal, the reviewing court reversed this ruling of the trial court. The *Prange* court considered the defendant's assertion "that the Act was intended to apply only to support devices which are used to support workmen, thus to the exclusion of support devices for material on a construction site" (109 Ill. App. 3d at 1129) and said:

> "The defense seeks to narrow the scope of the Act to scaffold and scaffold-like devices. *Matthews* is cited in support of this argument and interpretation. Such a reading of the Act is much too narrow. It has recently been pointed out that *Matthews'* narrow construction of the Act in this regard is not supported by any case authority and runs contrary to the express language of Section 60. [Citation.] ***
>
> * * *
>
> A narrow reading of the Act, focusing upon workman support devices only, ignores that the primary function of hoists, cranes and stays is not as support for men, but rather for materials. Those devices are specifically enumerated in the Act. Furthermore, as the *Urman* [court] points out, the statutory language indicates a desire to protect workmen in, on, around and under support devices for materials on a construction site. We conclude, as did the *Urman* court, that *the Act is intended to cover support devices used on a construction site, whether their purpose is to support workmen or materials.* In so doing, we expressly reject the contrary suggestion in the *Matthews* case." (Emphasis added.) (*Prange*, 109 Ill. App. 3d at 1129-30.)

The *Prange* court considered that when plaintiff was injured, the tractor-forklift was being used in a "support function" for materials as a "crane or hoist" might be used and, further, concluded that the forklift tractor was a "mechanical contrivance" within the Structural Work Act. The *Prange* court also rejected the "defense's other argument that Prange as the driver is unprotected" by the Act because "[i]t rests upon the erroneous conclusion in *Matthews* that only workers who are on, or who should have been on support devices are intended to be protected by the Act." (*Prange*, 109 Ill. App. 3d at 1131.) The court in *Prange*, and this court in *Urman*, rejected the proposition advanced by defendants here, that "[t]he Structural Work Act applies only to devices intended to support workmen."

Although the *Urman* court and the *Prange* court rejected the narrow interpretation of the Structural Work Act advanced in *Matthews*,

here asserted by the defendants, the court in *Carlson v. Moline Board of Education* (1984), 124 Ill. App. 3d 967, 464 N.E.2d 1239, nonetheless, adopted the narrow *Matthews* interpretation. In *Carlson*, the reviewing court considered whether a workman, who was severely injured when an assembly of 4,000-pound lockers fell on him, stated a cause of action under the Structural Work Act by alleging "that the assembly of lockers would not have fallen if it had been adequately braced with 'stays' or 'supports.' " (124 Ill. App. 3d at 972.) Although the *Carlson* court found the question troubling, it nonetheless resolved the issue by adopting the narrow approach taken in *Matthews* and concluded that the plaintiff's complaint failed to state a cause of action.

Although *Carlson* and *Matthews* took the narrow approach that the Structural Work Act applied only to devices intended to support workmen, the better and more logically reasoned *Urman* and *Prange* decisions held that the Structural Work Act was intended to apply to support materials as well as workmen.

In *Urman*, this court employed the literal terms of section 1 of the Structural Work Act (Ill. Rev. Stat. 1985, ch. 48, par. 60) in determining that two classes of persons were protected by the Act, *i.e.*, those working on a support device and those who pass by or under a support device. According to the court, these two classes of persons are protected by the Act from two classes of injuries, *i.e.*, injuries caused by the collapse or failure of any support device and injuries caused by the falling of any material that may be used or deposited in or on the device. This construction finds support in the literal language of section 1 of the Structural Work Act previously set forth. The Act expressly affords workmen protection from "the falling of any material." It would be unreasonable to conclude that it was the intention of the legislature to protect a workman from falling materials only when the workman was on a support device. Surely, it was the legislature's intention to also protect the workman anywhere on the construction site from falling materials, and the failure to provide proper support for materials which fall and injure a workman is as much a violation of the Structural Work Act as is the failure to provide proper support for the workman himself, which results in his injury. Any other construction of the Act would be patently absurd, particularly when it is recognized and the reviewing courts of this State have repeatedly held that the Act should be liberally construed when there is a need for liberal construction in order to protect and afford relief to an injured worker. *Rayfield v. Homart Development* (1981), 100 Ill. App. 3d 620, 427 N.E.2d 193.

*Urman* and *Prange* are premised on the literal language and purpose of the Structural Work Act. *Matthews* and *Carlson*, on the other hand, ignore the literal language and purpose of the Structural Work Act and judicially engraft an unwarranted limitation on the language of the Act. The *Matthews* court holds that "[t]he Act does not mandate every kind of support on a construction site, but only those which serve as a source of support for a worker" (*Matthews*, 90 Ill. App. 3d at 1027), even though there is no such limiting language in the Act, and other courts construing the Act have been properly guided by a liberal approach to the Act's interpretation. *Carlson*, similarly, follows *Matthews'* narrow approach in the interpretation of the Structural Work Act and relies almost exclusively on the same rationale.

Finally, based upon their erroneous conclusion that plaintiff's theory of the case is that "the racks had been improperly placed on their edge rather than their side," defendants attempt to distinguish *Urman* and argue that even under *Urman* "the absolute necessity that a cause of action involve a support device of some kind remains unchanged." Plaintiff, of course, agrees that *Urman* requires the use of a support device or the failure to provide a support device for the existence of a cause of action under the Structural Work Act. Plaintiff's theory of the case, however, was that he was injured as a proximate result of the defendants' failure to provide proper support with a forklift truck or cherry picker crane or some other appropriate mechanical contrivance for the bundle of storage racks which fell on him, injuring his left knee. Therefore *Urman* has direct application to the circumstances of this case.

In *Delgatto v. Brandon Associates, Ltd.* (1988), 172 Ill. App. 3d 424, 526 N.E.2d 384, this court followed the holding in *Prange* and *Urman*. In *Delgatto*, plaintiff, a sheet metal worker employed by a heating and ventilation company, was injured when an air duct assembly, which was part of a building renovation project, struck plaintiff in his back. Plaintiff filed a complaint which alleged that a radiator had been placed up against the duct work and that as plaintiff moved the radiator to gain access to the duct work, the injury occurred. Plaintiff, Delgatto, alleged that his injuries were the result of defendant's, Brandon's, failure to comply with the provisions of the Structural Work Act in (1) failing to provide a proper support for the piece of duct work, thereby rendering the duct work in an unstable position; (2) failing to provide a scaffold, support or other mechanical contrivance for the support of the duct work, which was unstable and unsteady; (3) failing to provide a scaffold, support or other mechanical

contrivance for the support of the duct work which could have safely and adequately supported the duct work while the plaintiff was working that area; and (4) failing to provide plaintiff with an adequate support, scaffold, or other mechanical contrivance which could have enabled him to avoid being hit by the duct work on the date of his accident. The defendant filed a motion for summary judgment. Finding that there was "no duty whatsoever" under the Structural Work Act, the trial court granted defendant's motion for summary judgment. (172 Ill. App. 3d at 427.) On appeal this court reversed. The *Delgatto* court considered Brandon's assertion that "the Act is not intended to impose liability for the failure to provide 'stays' or 'supports' " (172 Ill. App. 3d at 429) and, after an analysis of *Matthews* and *Carlson*, relied on by the defendant in *Delgatto*, as well as the defendants in the instant case, the *Delgatto* court followed *Prange* and *Urman* and stated:

> "We decided *Urman* one year after the decision in *Matthews*. In *Urman*, we concluded that a narrow construction of the Act as suggested in *Matthews* (and now *Carlson*) is illogical because classifying the other devices enumerated in the Act in addition to scaffolds (hoists, cranes, stays, ladders, supports, or other mechanical contrivances) as synonymous with scaffolding, a platform for workmen, ignores the commonsense usage and dictionary definitions of those terms. [Citation.] As the court in *Prange v. Kamar Construction Corp.* (1982), 109 Ill. App. 3d 1125, 441 N.E.2d 889, has correctly observed:
>
> > 'A narrow reading of the Act, focusing upon workman devices only, ignores that the primary function of hoists, cranes, and stays is not as support for men, but rather for materials. Those devices are specifically enumerated in the Act. Furthermore, *** the statutory language indicates a desire to protect workmen in, on, around and under support devices for materials on a construction site.'
>
> We therefore reject, once again, a narrow construction of the Act as suggested in *Matthews* and *Carlson* and reiterate that the Act is intended to cover support devices used on a construction site, and, necessarily, the failure to supply same, whether their purpose is to support workmen *or* materials." (Emphasis in original.) *Delgatto v. Brandon Associates, Ltd.* (1988), 172 Ill. App. 3d 424, 430-31, 526 N.E.2d 384.

The *Delgatto* court then held that the plaintiff's injuries were the proximate result of acts or omissions involving devices covered under the Structural Work Act which caused plaintiff to be struck by falling

materials on the site of the renovation project and that plaintiff's complaint stated a cause of action.

The supreme court relied on *Urman* in *Vuletich v. United States Steel Corp.* (1987), 117 Ill. 2d 417. In *Vuletich*, plaintiff, Mark Vuletich, was employed as a laborer by BMI Industries. U.S. Steel contracted with BMI to clean and repair a furnace located at a U.S. Steel plant. Plaintiff was instructed to clean the furnace. After cleaning the furnace, plaintiff walked to BMI's tool storage trailer to return the shovel and broom he had been using. Because the trailer was five feet above the ground level, temporary wooden stairs were constructed for entering and existing the trailers. On the day of the accident it had snowed and the stairs were covered with ice and snow and were slippery. As plaintiff exited the trailer and descended the stairs, he slipped and fell on the snow and ice. Plaintiff also alleged that his fall was caused by the wobbling of the stairs and the lack of a handrail. Plaintiff sought recovery under the Structural Work Act. The defendant filed a motion for summary judgment which was granted by the trial court upon concluding that the stairs on which plaintiff slipped did not constitute a "support" within the meaning of the Act. The appellate court reversed and remanded the case to the trial court, holding that there was a factual question as to how the stairs were actually being used at the time of plaintiff's fall and injury. The supreme court granted leave to appeal, reversed the appellate court and affirmed the circuit court's summary judgment for the defendant. The court stated "the main controversy in this case centers around whether the stairs were being used as a support or as a mere pathway at the time of plaintiff's injury." (*Vuletich*, 117 Ill. 2d at 422.) The court, relying on *Urman*, further stated:

> "In *Urman v. Walter* (1981), 101 Ill. App. 3d 1085, the court stated, '[A] floor is not a scaffold when it is being used merely as a walkway [citations], but if a worker relies on a partially completed floor for support as a working platform, he may recover.' [Citation.] Also, in *Quinn v. L.B.C., Inc.* (1981), 94 Ill. App. 3d 660, the court held that the floor of the building in question was not being used as a working platform at the time of plaintiff's injury and stated, 'Plaintiff did not rely on the floor as a support while working on the building; he merely utilized it as a path to reach the stairway and other parts of the structure. Simply stated, the floor was being used as a floor, the purpose for which it was designed.' [Citation.] *We agree with the holdings of these cases. Applying this reasoning to the case before us, we find that the stairs in question did not con-*

*stitute a support as that term is used in the Act. The stairs were but a pathway providing ingress and egress to and from the trailer wherein tools were stored. If the stairs had provided support for the plaintiff in the performance of some hazardous activity, or if he had used them as a working platform, then, as noted in the cases last cited, a different situation might prevail.*

\* \* \*

At the time of his injury the plaintiff was not engaged in any hazardous activity or any work that can be described as being of a particular hazardous nature. He was simply returning his broom and shovel to the trailer, just as a janitor might ascend some stairs to return a broom and shovel to a closet. If there were no stairs involved in this case, there would have been no serious contention that the injury was one covered by the Act. Under such circumstances *Urman* and *Quinn*, cited above, would be directly on point. Plaintiff's argument that the fact that stairs were involved somehow takes our case out of the law as cited in *Urman* and *Quinn* is not convincing." (*Vuletich v. U.S. Steel Corp.* (1987), 117 Ill. 2d 417, 423-24.) (Emphasis added.)

The court then held that the stairway in *Vuletich* "was not a support within the meaning of the Act." 117 Ill. 2d at 425.

We apply the primary rule of statutory construction that in construing a statute, a court should follow the statute's literal language, and we also adhere to *Urman, Prange, Delgatto* and *Vuletich*. We reject the defendants' contention and conclude that the Structural Work Act is intended to cover and applies to construction site support devices whether used to support material or workmen.

■ The defendants further argue that "[e]ven if the Structural Work Act was construed to require stays or supports for materials, plaintiff is still not entitled to recover in this case." This contention of the defendants' is predicated upon the erroneous premise that plaintiff's injury was caused by materials falling on him because the materials were placed on the wrong side of the support racks. Defendants argue that under *Urman*, a workman who is injured by materials which fall on him because they were wrongfully placed is not entitled to recovery under the Structural Work Act. Plaintiff correctly maintains, however, that he was injured because the materials which fell on him were not properly supported and that defendants' contrary characterization of plaintiff's case is not supported by the record.

In plaintiff's amended complaint plaintiff alleged:

"6. That at said time and place and prior thereto, the Defendants were then and there guilty of wilful violation of the Structural Work Act in one or more of the following ways:

(a) Failed to provide a safe, suitable and proper support for the aforesaid bundle of storage racks to prevent the storage racks from falling."

It was therefore alleged in a subsequent paragraph "[t]hat as a proximate result of the aforesaid wilful and wrongful acts and or omissions of the Defendant, the Plaintiff then and there sustained severe and permanent injuries." Thus, the defendants' conclusion that "[p]laintiff in this case did not contend that the failure to provide stays or supports for materials was the basis for liability" is inaccurate. The failure to provide proper support for the bundle of storage racks which fell on and injured plaintiff was the basis of plaintiff's claim under the Structural Work Act, and the trial evidence clearly supports plaintiff's contention that the failure to provide supports for the bundle of storage racks caused them to topple over.

Defendants quote the following statement of plaintiff's counsel during the conference on jury instructions:

"[PLAINTIFF'S COUNSEL]: With all due respect, your Honor, I do not believe that should be included. We have heard absolutely no testimony in this case that a stay should have been provided.

\* \* \*

Judge, again, we can't instruct the jury about a device under the Structural Work Act that they have not heard about. They have heard about cranes. *My safety expert, Judge, I asked him what should have been provided to support the bundle here. He said you do it with a crane or you do it with a forklift truck. He didn't say anything about stays, Judge.*

*How could all of a sudden now after two weeks of this jury hearing about forklift trucks and cranes suddenly with the instructions we start talking about stays and they are going to say what's a stay.* What does that have to do with this case?" (Emphasis added.)

Defendants mistakenly rely on plaintiff's attorney's above jury conference comments as support for the defendants' contention that plaintiff's theory of the case was not based on defendants' failure to provide support for the bundle of storage racks. Plaintiff's counsel's above comments were simply that plaintiff's case was not about stays and he clearly articulated that the case was about supports or, more correctly, was about defendants' failure to provide a proper support

for the bundle of storage racks which fell on plaintiff. The literal import of plaintiff's counsel's foregoing statements was that there should be no instruction on stays because the jury heard no testimony concerning stays and that all the testimony was about supporting the bundle with a crane or a forklift truck. We agree with plaintiff's counsel that an instruction concerning stays was therefore inappropriate.

Other statements of plaintiff's counsel at the conference on jury instructions fortified plaintiff's contention. When Caterpillar's counsel objected to a plaintiff's instruction because in his view "[t]here is no issue about cranes or other mechanical devices in this case," plaintiff's counsel correctly retorted:

> "That is my theory, you have heard the evidence in this case, your Honor, that it was the failure of a crane or a forklift truck, which is the mechanical contrivance to properly support these bundles, racks. That certainly is the issue in this case."

Plaintiff's counsel once again made plain that his theory of the case was that the defendants violated the Structural Work Act by failing to provide proper support for the bundle of storage racks which fell on plaintiff and that a crane or forklift truck was the appropriate mechanical contrivance to provide such support. This was also plaintiff's counsel's position in his opening statement to the jury, when he stated:

> "It will be our theory that it was the duty of the defendants under the Structural Work Act to provide safe, suitable and proper supports for these bundles to see that they do not fall over during the erection process."

Plaintiff's counsel's closing argument further confirmed that plaintiff's theory of the case was that defendants failed to provide proper support for the bundle of storage racks which fell on plaintiff.

■ Defendants acknowledge that the Structural Work Act has been upheld against attack on constitutional grounds, but defendants argue that the trial court so construed and applied the Act in this case in such a way that defendants were denied due process of law and thus the Act is unconstitutional as applied. The defendants did not present this point in their post-trial motion to the trial court, and the defendants therefore have waived the point for consideration on review by this court. *Hollembaeck v. Dominick's Finer Foods* (1985), 137 Ill. App. 3d 773, 484 N.E.2d 1237.

The defendants next contend that they were denied a fair trial by plaintiff's introduction of the opinion testimony of five previously undisclosed expert witnesses regarding the "unsafeness" of the procedure for unbundling the racks. The defendants argue that the admis-

sion of this expert testimony was erroneous for three reasons: (1) the five expert witnesses and their testimony had never been disclosed to defendants as required by Supreme Court Rule 220; (2) the opinion testimony involved matters of common knowledge and was therefore inadmissible; and (3) if the testimony was contended to be "lay" opinion, then it should have been excluded as incompetent.

Supreme Court Rule 220 (107 Ill. 2d R. 220(b)(1)) provides:

> "(1) Expert witness. Where the testimony of experts is reasonably contemplated, the parties will act in good faith to seasonably:
>
> (i) ascertain the identity of such witnesses, and
>
> (ii) obtain from them the opinions upon which they may be requested to testify. *In order to insure fair and equitable preparation for trial by all parties the identity of an expert who is retained to render an opinion at trial on behalf of a party must be disclosed by that party either within 90 days after the substance of the expert's opinion first becomes known to that party or his counsel or, if the substance of the expert's opinion is then known, at the first pretrial conference in the case, whichever is later.* \*\*\* All dates set by the trial court shall be chosen to insure that discovery regarding such expert witnesses will be completed not later than 60 days before the date on which the trial court reasonably anticipates the trial will commence. Upon disclosure, the expert's opinion may be the subject of discovery as provided in paragraph (c) hereof. Failure to make the disclosure required by this rule or to comply with the discovery contemplated herein will result in disqualification of the expert as a witness." (Emphasis added.)

In the case at bar, the plaintiff was permitted to introduce the opinion testimony of expert witnesses that the unbundling procedure was unsafe. None of these expert witnesses was disclosed by plaintiff as potential trial witnesses; therefore, the admission of their expert testimony was in total disregard of the requirements of Supreme Court Rule 220.

In *Prater v. Luhr Brothers, Inc.* (1977), 51 Ill. App. 3d 685, 366 N.E.2d 399, the court reversed a judgment for a plaintiff in a Structural Work Act case because of the erroneous admission of expert opinion testimony of a previously undisclosed expert witness. In *Prater*, the action was brought by a bridge painter to recover damages for foot injuries he sustained when he fell from a scaffold. During the trial, plaintiff was permitted to elicit testimony of an expert witness that the scaffold was unsafe and unstable. As in the instant

case, the witness in *Prater* had not been disclosed as a potential witness by the plaintiff in response to the defendant's discovery requests. The court held that it was error to admit the testimony, stating:

"In the case at bar, the trial court found, and we agree, that *the plaintiff's failure to disclose the expert was in violation of the spirit of the rules of discovery.* \*\*\*

\* \* \*

The content of the expert's opinion testimony involved matters of common knowledge and understanding. As such the evidence could properly have been held inadmissible. [Citation.] Since the issue before the jury, the safe or unsafe condition of the pics, was not a complicated one, the expert's testimony could only have been superfluous while adding the personal weight of the expert to the plaintiff's theory of the evidence. In addition, as the trial court noted, *since the expert had not been disclosed until the time of trial, both Luhr and Britz were at a disadvantage in countering his testimony.* For these reasons, we are of the opinion that the undisclosed witness should have been excluded from trial." (Emphasis added.) *Prater v. Luhr Brothers, Inc.* (1977), 51 Ill. App. 3d 685, 689, 366 N.E.2d 399.

Similarly, in the case at bar, the experts' testimony was on the unsafeness of the unbundling procedure, a crucial issue in the case, and the defendants were at a distinct disadvantage in countering their testimony because plaintiff failed to disclose them.

●6 The defendants further argue that the opinion testimony of the expert witnesses that the unbundling procedure was unsafe should have been excluded because it was on matters which required only common knowledge and understanding. Several of plaintiff's expert witnesses conceded that they had no particular knowledge or expertise in the field. Their opinions on the safety and the unbundling procedure, however, did not involve matters that were difficult of common comprehension or explanation. Their opinions were merely matters of common knowledge and should have been excluded on that basis. It is well settled that expert opinions may not be admitted on matters of common knowledge. (*Hernandez v. Power Construction Co.* (1978), 73 Ill. 2d 90; *Prater v. Luhr Brothers, Inc.* (1977), 51 Ill. App. 3d 685, 366 N.E.2d 399.) Because of plaintiff's improper introduction of the experts' inadmissible opinion testimony that the unbundling procedure was unsafe, the defendants are entitled to a new trial and the judgment in favor of plaintiff must be reversed.

The defendants contend the $900,000 jury verdict rendered against them in favor of plaintiff was grossly excessive for the injury

sustained by plaintiff, and the defendants rely on several arguments in support of their contention, one of which is that the injury to plaintiff's left knee was not sufficiently serious to warrant a $900,000 jury verdict. We disagree.

Plaintiff underwent three operations to his left knee as a result of his injury at Caterpillar. The first operation was to repair the quadriceps mechanism and remove part of the kneecap. The second operation was to make additional repair to the quadriceps mechanism and the third was to remove the remainder of the kneecap.

The uncontroverted testimony of plaintiff and the medical experts is that plaintiff suffered a severe, permanent, disfiguring injury to his left knee. Although employable, plaintiff's injury rendered him unable to work again as a carpenter or as a millwright on heavy construction. Therefore, contrary to defendants' contention, plaintiff's knee injury was serious and the effects permanent.

■ Defendants further suggest that the $900,000 verdict for plaintiff is excessive simply because the "entire cost of [plaintiff's] medical treatment was [only] $7,622.98." The medical treatment costs, however, do not necessarily render the $900,000 jury verdict in plaintiff's favor excessive. In *Lapidus v. Hahn* (1983), 115 Ill. App. 3d 795, 450 N.E.2d 824, the court approved a jury verdict of $350,000 even though medical and hospital expenses were only $3,695. The court noted that although the "award was about 100 times greater than special damages incurred," that rationale "is not the sole consideration in determining whether the award is excessive." (115 Ill. App. 3d at 802-03.) The award in *Lapidus* was approved by the reviewing court because of plaintiff's deformity, pain, and change of lifestyle as a result of her injuries. Similarly, in the case at bar, because of plaintiff's pain and deformity as a result of his injuries, we cannot conclude that the $900,000 damages awarded plaintiff are excessive simply because his medical expenses were only $7,622.98.

■ Defendants also contend that the $900,000 verdict awarded plaintiff by the jury is excessive because the amount "reflects the jury's acceptance of the requests by plaintiff's counsel in closing argument." Defendants then imply that this request by plaintiff's counsel is without foundation in the record. This contention by defendants is meritless.

Plaintiff's counsel in his closing argument to the jury requested damages comprised of various components. He requested the jury to find damages for lost wages between the date of plaintiff's injury and the date of trial in the amount of $246,031.68. The hourly wage rate was determined through the testimony of the business manager for

carpenters and millwrights of a local union. Plaintiff was employed through this union at the time of his injury. Plaintiff's counsel also requested, as another component of damages, the loss of future earnings in the amount of $300,000. This amount was determined by a 40-hour work week, multiplied by an hourly rate of $20.72, which was the 1985 rate for carpenter's work, times the number of weeks remaining for the plaintiff to work in the future, from the date of trial until he reached 65 years of age, minus an estimate of what plaintiff would be able to earn over the same period of time. This sum was then reduced to its present-day value. This was a reasonable basis for calculating plaintiff's future earnings. Based upon the trial evidence, we do not conclude that the $300,000 amount for plaintiff's future wages, from the date of trial to the date of plaintiff's retirement, is unreasonable.

As another component of plaintiff's damages, plaintiff's counsel also requested an award of $50,000 for plaintiff's pain and suffering for the nine years from the date of plaintiff's injury to the date of trial and $100,000 for plaintiff's future pain and suffering. The jury's award for pain and suffering is left to the jury's conscience and judgment. *Fedt v. Oak Lawn Lodge* (1985), 132 Ill. App. 3d 1061, 478 N.E.2d 469; *Caley v. Manicke* (1962), 24 Ill. 2d 390.

In *Fedt v. Oak Lawn Lodge* (1985), 132 Ill. App. 3d 1061, 478 N.E.2d 469, the court affirmed an award of $262,800 for plaintiff's pain and suffering, the limitations on plaintiff's physical activities resulting from his injuries, the series of operations endured by him and the length of his convalescence. Similarly, in the instant case, plaintiff's physical activities have been severely curtailed, he has endured three operations and has had a lengthy convalescence. Under these circumstances we cannot say that the $150,000 plaintiff requested and the jury awarded for his pain and suffering is excessive.

Plaintiff further asked as a component of damages an award of $200,000 for disability and disfigurement. Like an award for pain and suffering, an award for disability and disfigurement is also peculiarly within the province of the jury and an award of $200,000 cannot be said to be excessive under the circumstances presented here.

Finally, plaintiff's counsel requested $7,622.98 in medical bills.

Based upon the trial evidence we do not conclude that the $900,000 jury verdict in favor of plaintiff was excessive.

■ Lastly, the defendants contend that the jury verdict denying defendants indemnity is against the manifest weight of the evidence. In support of their contention, defendants cite *Miller v. DeWitt* (1967), 37 Ill. 2d 273, which established that a passively negligent

tortfeasor may obtain indemnification from an actively negligent tortfeasor. It is clear from *Miller* that the determination of whether a party is an active tortfeasor or a passive tortfeasor is a question of fact for the jury. Furthermore, it is the jury's function to evaluate the weight of the evidence and to assess the credibility of the witnesses. (*Bass v. Washington Kinney Co.* (1983), 119 Ill. App. 3d 713, 457 N.E.2d 85.) The jury's verdict will not be disturbed unless the verdict was palpably erroneous, the opposite verdict is clearly compelled, or the findings appear to be unreasonable, arbitrary and not based upon the evidence. *Bass v. Washington Kinney Co.* (1983), 119 Ill. App. 3d 713, 457 N.E.2d 85.

In the case at bar, the evidence established that the defendants were the active tortfeasors. The defendants were present on the jobsite, were familiar with the construction practices, had the authority to stop work, had the right to schedule the work, actively directed the men, and controlled the machinery. Therefore we will not disturb the jury's verdict denying defendants indemnity.

For the reasons stated, the judgment in favor of Harold Meyer against Caterpillar Tractor Company and Frazier Manufacturing Corp. is reversed and the cause is remanded for a new trial. The judgment in favor of Engineered Structural Products against Caterpillar Tractor Company and Frazier Manufacturing Corp. on the third-party complaint is affirmed.

Reversed and remanded.

LORENZ, P.J., concurs.

JUSTICE MURRAY, specially concurring:

I specially concur only in the hope that the Illinois Supreme Court or State legislature will clarify the question of whether a device designed and used only to support materials is a scaffold, hoist, crane, etc., within the meaning of the Illinois Structural Work Act (Ill. Rev. Stat. 1985, ch. 48, par. 60 *et seq.*). The case of *Urman v. Walter* (1981), 101 Ill. App. 3d 1085, 428 N.E.2d 1051, cited by the majority, supports that proposition. The case of *Matthews v. Commonwealth Edison Co.* (1980), 90 Ill. App. 3d 1024, 414 N.E.2d 147, and other cases are to the contrary. The recent case of *Seeden v. Metropolitan Sanitary District* (1988), 172 Ill. App. 3d 239, 526 N.E.2d 482, describes the conflict, but does not resolve it. The recent Illinois Supreme Court decision of *Vuletich v. United States Steel Corp.* (1987), 117 Ill. 2d 417, 512 N.E.2d 1223, seems to resolve the issue contrary

to the court's opinion in this case, but cites the case relied on by the majority on the point of *Urman* with approval. The issue should be finally decided.